We hold for respondent.

*Decision will be entered for the respondent.*

LOUIS H. AND MADELENE DIAMOND, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 39473-86.     Filed February 23, 1989.

*Joseph M. Jones, Samuel Paul Kastner,* and *Robin Kofsky Gold,* for the petitioners.

*Dianne Crosby* and *David Click,* for the respondent.

WHITAKER, *Judge:* By statutory notice dated July 14, 1986, respondent determined deficiencies in and additions to petitioners' Federal income tax for the years and in the amounts as follows:

| Year | Amount | Addition to tax sec. 6659 [1] |
|------|--------|-------------------------------|
| 1981 | $19,174 | $5,752.20 |
| 1982 | 7,523 | 2,256.90 |

Respondent also determined that petitioner was liable for increased interest under section 6621(c). The issues are: (1) Whether Elco R&D Associates (the project partnership), an Israeli limited partnership, was engaged in a trade or business so that expenses incurred by it in 1981 and 1982 for research and development may be deducted pursuant to section 174; (2) whether Robotics Development Associates, L.P., (Robotics), a Maryland limited partnership in which petitioner was a limited partner, is entitled to deduct payments to its partners for management fees; (3) whether and to what extent Robotics may amortize its claimed partnership organizational expenses over 60 months pursuant to section 709; (4) whether Robotics is entitled to deductions for legal, accounting, and consulting expenses; (5) whether petitioner is liable for an addition to tax pursuant to section 6659; and (6) whether petitioner is liable for increased interest pursuant to section 6621(c). Should

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

petitioner prevail on the primary issue pertaining to re-search and development expenditures, the parties have agreed that further briefing will be necessary to enable the Court to reach a decision as to the extent such research and development expenditures may be deducted under the project partnership's method of accounting.

### FINDINGS OF FACT

Some of the facts are stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. At the time the petition was filed, Louis Diamond was a resident of Bethesda, Maryland, and Madelene Diamond[2] was a resident of Washington, D.C.

This dispute arises from petitioner Louis Diamond's ownership of an interest in Robotics, a Maryland limited partnership, which was a limited partner in the project partnership, an Israeli limited partnership. The project partnership's general partner is Elco Ltd. (Elco), a publicly held Israeli corporation. Robotics was organized in 1981 with three general partners and initially one limited partner holding a 99-percent interest. This limited partner interest was divided into 26 limited partnership interests which were sold to investors including petitioner.

Robotics' general partners are Itzhak Yaakov (Yaakov), G-B Energy Systems, Inc. (G-B Energy), and the managing general partner, Capital Corp. of Washington (Capital), each of whom contributed $16,100[3] for a 1/3-percent interest in Robotics. Yaakov, who resided in New York during the years in issue, was formerly a general in the Israeli army in charge of research and development. From 1974 through 1977, he was the Chief Scientist in the Israeli Ministry of Industry. G-B Energy is a Connecticut corporation wholly owned by Jacob E. Goldman (Goldman), who was formerly director of Ford Motor Co.'s Scientific Research Laboratory and head of research and development at Xerox Corp. Capital is a District of Columbia corporation wholly owned by Robert E. Slavitt (Slavitt), who is an investment banker

---

[2]Madelene Diamond is a petitioner herein solely by reason of having signed a joint Federal income tax return with her husband. All further references to petitioner are to Louis Diamond.

[3]Each general partner's capital contribution included $7,223.33 which was the proceeds of a loan from the Industrial Development Bank of Israel, Ltd., as described more fully below with reference to petitioners.

and is involved in organizing research and development projects in Israel.[4] Slavitt first became involved in organizing and funding research and development projects in Israel in 1981. From that time until the time of trial, he had been involved in projects with 13 different Israeli companies. Each of the Israeli companies with which he was involved was marketing in the United States through either joint ventures or OEM (other equipment manufacturer) contracts.[5] Slavitt had been involved with three Israeli companies which had tried unsuccessfully to penetrate the U.S. market on their own.

Slavitt and Yaakov first met in May 1981. They discussed the general climate for investment in high technology in Israel, and Yaakov introduced Slavitt to several specific projects, including a project proposed by Elco for the development of an arc welder with an optical seam follower (the project or the robot). As a result of that meeting, Slavitt investigated each of the proposed investments. He subscribed to a number of professional magazines dealing with robotics and performed a certain amount of research to familiarize himself with the field. He obtained data from the Department of Commerce, and spoke with several technicians, including Goldman. From his investigation, Slavitt became convinced that robotics was a viable, promising industry. He learned that the United States was behind the Japanese in utilizing this technology, but was trying to catch up, thus creating a potentially large U.S. market for this kind of technology.

After identifying robotics as an area in which he might want to invest, Slavitt retained the services of Goldman and asked him to go to Israel to investigate certain aspects of the Project as then proposed. Particularly, Goldman was asked to assess the feasibility of the technology, the ability of Elco to pursue and develop the technology, and the market for any product which might be developed. Goldman returned with the opinion that, while there are no automobile manufacturers in Israel, robotics technology would be

---

[4]The project partnership's general partners were to perform certain services as set forth in the project partnership agreement. As Goldman and Slavitt were the only persons performing such services on behalf of G-B Energy and Capital, all further references to the Project Partnership's general partners are to Yaakov, Goldman, and Slavitt.

[5]Slavitt defined an OEM contract as an arrangement whereby a company would market an Israeli product under its own name and label.

well-suited for that use in the United States. As a result of Goldman's investigation, Slavitt became convinced not only of the promise of robotics technology, but of the talent which Goldman possessed in both the technical and marketing areas.

On August 20, 1981, Slavitt himself went to Israel to further investigate the project. While there, he consulted both American and Israeli counsel concerning tax and other matters. During this trip, he was introduced to representatives of Elco who gave him an overview of the project, and convinced him that they had the ability to develop a marketable product. However, because Elco did not have the funds to pursue the research and development of the technology either alone or in conjunction with the chief scientist's office, it sought outside investors.

Elco had been approached by three different investors, but decided to team up with Robotics because of the expertise and connections of Yaakov and Goldman, both of whom were expected to contribute at later stages in the development of the robot. Elco expected to draw upon Yaakov's expertise in research and development and his connections with the chief scientist's office, while Goldman's participation was sought because of his connections with the U.S. automobile industry and his expertise in the technical and marketing areas. Elco desired that these two men be partners in any venture or entity that invested in the robot so as to give them some financial incentive.

Through its general partners, Yaakov and Slavitt, Robotics entered into negotiations with Elco for the formation of a joint venture for the development and exploitation of the Project. Elco was represented by its vice president for finance, Uri Kviatek. These negotiations culminated in an agreement dated May 1, 1981,[6] which formed the project partnership. Pursuant to this project partnership agreement, Elco was to contribute to the project partnership the

---

[6]It is unclear on this record why this agreement is dated May 1, 1981, when it appears from Slavitt's testimony that the decision to go forward with the project had not been made even as late as August of that year. Neither is it apparent when Robotics was first organized with the one limited partner who served in that capacity until investors were found. We think the probable scenario is that Slavitt found what he thought to be a good investment, both from a profit and tax standpoint, set up the partnership structure, and found investors after securing Elco's commitment. The sequence of these events, however, has little bearing upon the resolution of this case.

lesser of 5.88 percent of the total investment[7] in the project or $250,000. Elco was also to contribute "the exclusive right, title, and interest in all the Technology which it presently possesses as well as any Technology conceived, made, gained, acquired or developed in the course of or as a result of the implementation of the Project." For its part, Robotics was to contribute $500,000 upon the approval of the project by the chief scientist and execution of a loan agreement with the Industrial Development Bank, and cash in installments during the following months and in the following amounts:

| Month | Amount |
| --- | --- |
| February 1982 | $325,000 |
| July 1982 | 75,000 |
| February 1983 | 325,000 |
| July 1983 | 275,000 |
| February 1984 | 325,000 |
| May 1984 | 150,000 |

The project partnership agreement conferred upon Elco the following additional rights and duties:

5. *Obligations and Undertakings by [Elco]*
   (a) *Research and Development; Exploitation.*

(ii) [ELCO] agrees that (1) the actual research and development work on the Project shall be carried out by [Elco], at its premises and using primarily its employees and equipment, (2) it will provide, within the framework of the budget of the Project approved by the Chief Scientist, such personnel and facilities and devote such time to the Project as shall be required for the diligent pursuit of the Project Partnership's objectives, (3) the undertakings of [Elco] under this Agreement shall be performed or otherwise carried out under the general supervision and management of Mr. Gideon Gelman or a suitable successor selected by [Elco]; provided, however, that [Elco] may employ a third party (including, without limitation, an affiliate) as sub-contractor to carry out all or part of the research and development work on the Project or may consult with any third party (including, without limitation, an affiliate) in connection with the research and development work on the Project if (y) such employment of a sub-contractor or consultation shall not violate the [Chief Scientist] Agreement and (z) such employment of a sub-contractor or consultation shall not in any manner relieve [Elco] of its obligations under this Agreement in respect of the research and development work on the Project.

---

[7]Robotics' investment was defined by the preamble of the project partnership agreement to include amounts loaned by the office of the chief scientist as described below.

(iii) In the event that [Elco] determines that the manufacturing, production and/or marketing of any product resulting from the research and development work of the Project should be carried out by [Elco] and/or any one or more of its affiliates, (1) such manufacturing, production and/or marketing activity shall be carried out exclusively by it and/or any such affiliate in the capacity of an exclusive and irrevocable licensee (such license to survive the termination of the Project Partnership), * * * and not in [Elco's] capacity as a general partner of the Project Partnership, * * * . Notwithstanding the foregoing provisions * * * it is hereby agreed that [Elco] or such affiliate shall have no obligation to carry out any manufacturing, production and/or marketing itself in the event that [Elco] shall determine that such manufacturing, production and/or marketing should be carried out wholly or partly by any third party or parties * * * .

In the event that Elco exercised the right pursuant to section 5(a)(iii) of the project partnership agreement to make itself or an affiliate exclusive and irrevocable licensee, the project partnership agreement set up a schedule of fees to be paid by Elco to the project partnership, based on Elco's gross receipts. Pursuant to that schedule the project partnership was to receive 5 percent of Elco's gross receipts until Robotics received 65 percent of its investment. The project partnership was to receive 4 percent of the next $10 million of gross receipts, 3 percent of the next $5 million of gross receipts, and 2 percent of any gross receipts over $15 million. Robotics was to receive 99 percent of the fees paid to the project partnership. The project partnership agreement contained provisions for an adjustment of these fees in the event that Elco applied the technology to products other than the robot. However, any of the "Fees payable to the Project Partnership with respect to any fiscal year shall not exceed twenty-five percent (25%) of the pre-tax profits for such fiscal year of the manufacturing licensee under Section 5(a)(iii) in manufacturing and selling the products." To the extent that the fees otherwise payable under the project partnership agreement exceeded 25 percent of Elco's pre-tax profits, such excess was carried over to the next year. If, at the end of the partnership's 50-year life, there is an accumulated amount of fees unpaid, that accumulated amount "shall be disregarded and shall no longer be payable." In the event that Elco exercised its rights under section 5(a)(iii), the Project Partnership Agreement gave Elco the right to convert Robotics' right to receive distribu-

tions into an equity interest in the manufacturing licensee, either Elco or an affiliate, which would incorporate either in Israel or the United States.[8]

Section 6(d) of the project partnership agreement gave Elco the right to transfer all or any of the rights to the project to any third party other than Elco or its affiliate, subject to Elco's obligation to give notice to Robotics of the transaction and the terms thereof. In the event of such transfer, Robotics had the right within 30 days to object to the transfer "on reasonable grounds." In the event of such a transfer, Robotics would "receive in cash an amount equal to 33⅓% of all gross receipts of the Project Partnership * * * with respect to such * * * transfer after deduction of the direct expenses incurred in such * * * transfer, and the balance of such receipts shall be paid to [Elco]." As of the date of trial, Elco had neither marketed the robot as exclusive licensee, nor had it transferred any rights to any third party.

In general, the project partnership's profits and losses were to be allocated 94.45 percent to Robotics and 5.55 percent to Elco, except that if Robotics' share of losses ever equaled its investment in the project partnership, all further losses would be allocated to Elco. The losses that passed through the project partnership to Robotics were allocated 99 percent to the limited partners and 1 percent to the general partners, to the extent such losses were attributable to the funds contributed by Robotics' limited partners. Further losses, and all gains, were allocated in the same ratio as cash-flow. Cash-flow was to be distributed 100

---

[8]In order for this equity conversion option to be exercisable, such licensee was required to (1) make a public offering of its shares in the United States; (2) cause the shares allotted to Robotics to be registered with the Securities and Exchange Commission; and (3) cause such shares to be allotted to Robotics immediately after the public offering. The percentage of Robotics' equity participation was to be fixed by calculating the ratio which the amount of Robotics' investment bore to the total price of the public offering, which was to be reduced to the extent Robotics had received certain distributions from the project partnership prior to the exercise of the equity conversion option. In the event that Elco exercised the equity conversion option, Robotics' right to receive "Fees" from Elco as exclusive licensee of the project would be reduced to 0.3 percent of all gross receipts received during the 10 years following its exercise. Elco could elect to exercise the option to the extent of less than 100 percent of Robotics' interest, in which case Robotics' right to receive "Fees" would be reduced only to the extent that the equity conversion option was exercised. An example given in the project partnership agreement stated that "such reduced fee shall be 0.18%, in lieu of 0.3%, if only 60% of said right is converted * * * 40% of the Fees * * * will continue to apply if 60% of said right is converted."

percent to the limited partners to the extent attributable to "Continuing Royalty Payments"; to the extent attributable to "Capital Transactions" and "Stock Transactions," cash-flow was distributed 70 percent to the limited partners and 30 percent to the general partners, or if the limited partners had yet to recover their investment, 85 percent to the limited partners and 15 percent to the general partners.[9]

On or before November 23, 1981, Robotics sold, through its agent Sheltered Investments, Inc.,[10] 26 limited partnership units pursuant to a private placement memorandum of even date. Those persons purchasing units in the partnership joined the existing general partners in entering into the Robotics' amended limited partnership agreement dated December 15, 1981.[11] Petitioner purchased one-half of one partnership unit for $91,675, giving him a 1.9038-percent interest in Robotics. Upon entering the partnership, petitioner contributed $15,000 in cash, and was required to execute notes in the amounts and due on the dates as follows:

| Amount | Due date |
|---|---|
| $7,500 | 2/1/82 |
| 7,500 | 7/1/82 |
| 7,500 | 2/1/83 |
| 7,500 | 7/1/83 |
| 5,000 | 2/1/84 |

---

[9]"Capital Transactions," "Stock Transactions," and "Continuing Royalty Payments" were defined in the Robotics partnership agreement as follows:

"Capital Transaction" means a disposition by [Robotics] of any interest in a Project Partnership; a refinancing by [Robotics], insurance award received by it or similar transaction which is attributable to capital in accordance with generally accepted accounting principles; or a distribution received by [Robotics] from a Project Partnership which, in accordance with generally accepted accounting principles, is attributable to a capital transaction of such Project Partnership.

\*     \*     \*     \*     \*     \*     \*

"Stock Transaction" means the stock or equity to be distributed to [Robotics] pursuant to the option granted to Elco, \* \* \* to convert all or any part of [Robotics'] right to royalty payments from the Project into a stock or equity participation in a publicly held company to be incorporated in the United States or Israel (the "New Company"). Such New Company would receive an exclusive license with respect to the Invention developed by the Project Partnership and such New Company would make a public offering of its shares. In addition to receiving stock in the New Company, the Limited Partners of [Robotics] would receive a continuing royalty payment for ten (10) years in such amount as set forth in the Project Partnership Agreement (the "Continuing Royalty Payment").

[10]Sheltered Investments, Inc., was wholly owned by Slavitt.

[11]Robotics' original limited partner was liquidated upon the admission of the investing limited partners. The original partnership agreement was not offered into evidence.

The remaining $41,675 of petitioner's capital contribution was the proceeds of a loan, described below, which petitioner received from the Government of Israel, through the Industrial Development Bank of Israel, Ltd. Each limited and general partner of Robotics was the recipient of a similar loan and each limited partner executed a special power of attorney appointing each general partner his agent in connection with such loans.

Pursuant to the Robotics partnership agreement, its general partners were to perform "all services necessary or desirable for the proper management and operation of [Robotics'] business" subject to the provisions of that agreement and Israeli law. These duties included supervision of the expenditure of partnership funds and review of all project projections and marketing activities. In return for providing these services, the general partners were to be paid the aggregate amount of $271,000 "during the years 1982 through 1983." While these services were to be performed over [the] Robotics' life, there was no provision for the payment of fees after 1983. None of the general partners nor any affiliate thereof was to receive any disbursements from Robotics other than management and project review fees and partnership distributions.

Yaakov was instrumental not only in negotiating the project partnership agreement, but also in assisting in administrative matters and in defining the project itself. He had regular consultations with the project's manager, Gideon Gelman, and negotiated with the chief scientist's office when the decision was made to narrow the scope of the project to the development of the optic system only. His status as a former chief scientist was influential in this regard, and also in his negotiations with the then-current chief scientist regarding budget increases. Finally, he introduced the project to one potential buyer with access to the U.S. market.

Although he was a general partner in the project partnership's limited partner, Goldman assumed the role of supervising the research and development activities of the project, providing feedback on the market available for such a robot, and helping the project partnership to make contacts in the American marketplace. Goldman made four

or five trips to Israel from late 1981 through 1982, particularly to meet with Elco's president; he also met with representatives of Elco during their visits to the United States. As he was familiar with the status and existence of the type of research and development in this area in the United States, Goldman could prevent the project from being duplicative.

Pursuant to the project partnership agreement, Elco was to secure the approval of, and in its individual capacity enter into an agreement with, the office of the chief scientist for development of the robot (the chief scientist agreement). That agreement provided that, in exchange for financial assistance from the Israeli Government, Elco would adhere to certain reporting requirements and would not exploit the results of any resulting invention or patent outside of Israel without the prior written consent of the Israeli Government. That financial assistance was in the form of a loan to each individual partner of Robotics in an aggregate amount (less certain expenses) equal to the amount of financing supplied by Robotics. Only Elco could obtain a patent for any invention which was the result of the research, unless prior written consent was obtained from the chief scientist and Elco took all legal steps to ensure that the invention would not be exploited outside of Israel without the Government's consent. The chief scientist agreement also contained the following provision:

If the Applicant [Elco] does not exploit in Israel the inventions, patents, know-how or other results which will be reached during the conduct of the Research or derived therefrom (hereinafter the "Patents"), or does not commercialize them in Israel within seven years from the termination of the Execution Period [which extended from 4/1/81 to 3/31/82] (initial or extended—if extended) (hereinafter "the Exploitation Period"), the rights therein will pass to the Government. * * *

In the event that the rights to the project passed to the Israeli Government under this clause, any proceeds that it derived would go first to repayment of the loan, then to payment of the expenses incurred by the project partnership in developing the robot. The Government would keep any and all remaining profits. Elco was empowered to transfer to the project partnership any of its rights under

the operative portions of the chief scientist agreement, but did not do so.

The loans received by each of Robotics' partners and referred to in the chief scientist agreement were memorialized in a separate agreement (the loan agreement), which called for the Government of Israel, through the Industrial Development Bank of Israel, Ltd., to loan to Robotics' partners, individually, the aggregate sum of 4,621,039 Israeli shekels, to be disbursed in installments. The first installment was to be disbursed within 2 months from the date of the commencement of research, and was to be one-quarter of the principal amount of the loan. A subsequent installment was to be disbursed within 30 days after the submission of an expense report, which was to be filed by Elco within 120 days after the signing of the research agreement. Each subsequent installment was to be disbursed within 30 days of the submission of subsequent expense reports, which were to be submitted "from time to time." The amounts to be disbursed after submission of these periodic expense reports (which were to be approved by the office of the chief scientist) were equal to one-half of the expenses incurred during the period covered by the report. However, no more than 80 percent of the principal balance of the loan was to be disbursed prior to the submission of a final report.

The loans were to bear 6-percent simple interest; however, interest was not to accrue until the chief scientist determined that the project was complete. Accrued interest was not payable until the expiration of 12 years after receipt of the first installment. On the dates on which Robotics was required to make payments on behalf of its partners, such payments were to be no less than 25 percent of Robotics' net profit, as shown by certified financial statements.

Robotics was represented in Israel by Worldtech Israel, Ltd. (Worldtech), which was organized by Yaakov after he left his post as chief scientist.[12] Pursuant to its November 20, 1981 agreement with Robotics, Worldtech was to make periodic visits to the site where research was being con-

---

[12]Yaakov owned only a 10-percent interest in Worldtech when it was first formed, its major shareholders being one American and two Israeli corporations. He later acquired two-thirds of the stock of that company.

ducted, monitor Elco's reports to the chief scientist and payments made in return, and otherwise act as Robotics' agent in Israel. For its services, Worldtech was to be paid an amount not to exceed the lesser of $50,000 or 1.282 percent of the total research budget. Worldtech was actually paid $15,000 in 1981 and $35,000 in 1982. The agreement was to terminate upon completion of the contemplated services or on December 25, 1985, whichever was to occur first.

On November 23, 1983, Robotics entered into a project review contract with Israel Development Corp. (IDC), which was formed by Slavitt in 1981[13] to monitor this and other similar projects. IDC was to report to Robotics' general partners, who would in turn report to its limited partners, concerning all financial transactions taking place with respect to the Project. IDC's undertaking pursuant to its contract with Robotics committed it to:

* * * reviewing and reporting to the General Partners of [Robotics] as to the progress of the Project Partnership with respect to the Robot Project through its various stages, including the research and development stage, the manufacturing stage, the marketing stage and the future exploitation stage; the preparation of quarterly reports; reviewing the annual budget of [Robotics]; reviewing the annual and quarterly reports submitted by Elco to [Robotics]; reviewing [Robotics'] tax return and otherwise promoting the business of [Robotics].

The term of the contract was to run from the date of its execution "until such time as [Robotics] is terminated," which was to be December 31, 2031.[14] However, IDC's entire fee of $150,000 was paid $21,000 in 1981 and $129,000 in 1982.

On December 24, 1981, Elco, in its capacity as general partner of the project partnership, and pursuant to its authority to do so contained in the project partnership agreement, entered into a subcontract agreement with itself individually "to carry out the Initial Research and Development subject and pursuant to the terms and conditions of the Project Partnership Agreement." Pursuant to that subcontractor agreement, such initial research and develop-

---

[13]Slavitt was IDC's sole shareholder.

[14]Robotics' existence could be extended by unanimous consent of all general and limited partners, or could be shortened as provided in the Robotics partnership agreement or by operation of law.

ment was to be carried out primarily by Elco Robotics, Ltd., a subsidiary of Elco. In consideration of its undertaking to perform such services, Elco as subcontractor was to be paid $1,900,000 by the project partnership.

During the course of the research and development of the project, it was decided to shift the emphasis of the research from the robot as a whole to the optical seam follower, as there were more than enough robots already on the market capable of performing the required task. A prototype was developed in 1984 or 1985, of which fewer than 12 units were sold or loaned to potential customers. This prototype incorporated technology which Elco management considered to be a breakthrough. Elco had anticipated that at this point secondary financing would be needed for purposes of marketing and production. Elco was hopeful that Robotics would participate in this secondary financing. However, the Robotics limited partners were unwilling to make any further investments, and Elco was ultimately unsuccessful in obtaining any such financing, in large part because of a crisis in the automation industry at about that time. Those industrial customers which Elco had anticipated would be the robot's primary market reduced employment and production in the robotics industry by one-third to one-half.

At the time of trial, Robotics was negotiating with a Belgian firm which had exhibited interest in the sensing device. There were also negotiations between Slavitt, as Robotics' general partner, and Elco for amendment of the project partnership agreement which would allow Robotics to share in the profits derived from any sale on a 50-50 basis. During the course of these negotiations between Elco and Robotics, Kviatek wrote a letter to Slavitt in which he stated that Elco:

* * * for and on behalf of the Project Partnership, was at all times (and it is at the present time), ready, willing and able, to entertain any economically attractive offer from another party (including the U.S. partnership [Robotics] or a party introduced by the U.S. Partnership), which party is willing to acquire non-exclusive rights in the Technology, * * * (subject, of course, to any applicable requirements of the Chief Scientist in the Israeli Ministry of Commerce and Industry), * * *

While Elco was willing to consider arrangements other than those contained in the project partnership agreement, it would not, even as late as January 1988, relinquish its option to become exclusive licensee under section 5(a)(iii).

OPINION

*Section 174 Deductions*

Section 174(a)(1) states that "A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction." Prior to the Supreme Court's decision in *Snow v. Commissioner*, 416 U.S. 500 (1974), such expenses incurred before the actual commencement of business were disallowed as nondeductible pre-operating expenses. See *Best Universal Lock Co. v. Commissioner*, 45 T.C. 1 (1965); *Koons v. Commissioner*, 35 T.C. 1092 (1961). *Snow* gave section 174 broad application vis-à-vis other sections of the Code containing the phrase "trade or business." As an example, the Court compared section 174 with section 162 stating that "Congress wrote into section 174(a)(1) 'in connection with,' and section 162(a) is more narrowly written than is section 174, allowing 'a deduction' of 'ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business.'" *Snow v. Commissioner, supra* at 503.

Following the Supreme Court's mandate, this Court held in *Green v. Commissioner*, 83 T.C. 667, 686 (1984), that "the phrase 'in connection with a trade or business' used in section 174 should not be limited by other restrictive definitions of 'trade or business' which had been suggested for other sections of the Code." However, in order to take advantage of section 174,

the taxpayer must still be engaged in a trade or business *at some time,* and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business * * * [*Green v. Commissioner, supra* at 686-687.]

We went on to hold that the taxpayer's partnership could not have been engaged in a trade or business as it had disposed of all the incidents of ownership by assigning all its rights in the inventions in that case to a third party. See *Green v. Commissioner, supra* at 689. Following this assignment, the partnership's activities were purely ministerial; the taxpayers were no more than mere investors. After our decision in *Green,* we held in *Levin v. Commissioner,* 87 T.C. 698 (1987), affd. 832 F.2d 403 (7th Cir. 1987), that the grant of an exclusive license foreclosed the possibility that the licensor could be engaged in a trade or business in connection with the licensed product, as the licensor was deprived of control over the product. *Levin v. Commissioner, supra* at 726-727. The precise question here is whether section 5(a)(iii) constitutes a license of the type before us in *Levin* or, as petitioner argues, an option to acquire a license. That determination is to be made with respect to the project partnership. See *Levin v. Commissioner, supra* at 725.

Respondent argues that this case is controlled by *Green* and the right granted to Elco by section 5(a)(iii) of the project partnership agreement, whereby Elco may become exclusive licensee with respect to any product of the research, is in reality a sale or exchange of all rights to any such product. Alternatively, respondent contends that section 5(a)(iii) is in substance an immediate grant of an exclusive license to exploit the robot and the result in *Levin* should apply here. Petitioner distinguishes *Green* by arguing that section 5(a)(iii) does not constitute a sale, but merely an option to acquire a license. Petitioner argues that *Levin* is distinguishable since there is a possibility that Elco will not exercise its right, and the door will be open for the project partnership or Robotics to exploit the results of the research. Petitioner contends that the project partnership need not have past or current sales in order to be considered to be engaged in a trade or business. Petitioner further argues, citing *Green,* that the project partnership need only be "capable of engaging in a trade or business at some time." We find petitioner's arguments to be without merit as applied to the facts of this case, and hold for respondent on this issue.

In *Levin,* we found it unnecessary to determine whether the transfer of rights by the licensor constituted sales of the inventions to the licensee, since "even if the agreements granted only licenses, they deprived the partnerships of control over the manufacture, use, and sale of the developed machines for virtually the entire lives of the partnerships * * * ." *Levin v. Commissioner, supra* at 726-727. Respondent urges us to find such a license here. However, we need not determine whether section 5(a)(iii) is the equivalent of such a license, since even if it does constitute an option, there is no realistic prospect that the robot would ever be exploited in any trade or business carried on by any one other than Elco. In so holding, we adopt the reasoning of the Seventh Circuit in *Spellman v. Commissioner,* 845 F.2d 148 (7th Cir. 1988), affg. a Memorandum Opinion of this Court.

The facts in *Spellman* are somewhat similar to the facts before us. In *Spellman,* the taxpayer was a limited partner in Elmer South, which was a limited partner in Sci-Med, whose general partner was an Israeli corporation. The agreement creating Sci-Med provided that Sci-Med would enter into a research and development agreement with Teva,[15] to which it would contribute $855,000 for the development of new antibiotics. Teva was to have the exclusive right to market the antibiotics developed as part of the specific project, and Sci-Med was to become the owner of any byproducts developed under the agreement which were not developed as part of that project. Teva was given the exclusive right to use those byproducts in connection with the exploitation of the antibiotics developed as part of the project, and was given the further option to purchase the remainder of Sci-Med's rights in these byproducts for $20,000. Citing *Green,* this Court held that the exclusive license agreement "effected a relinquishment * * * of Sci-Med's proprietary interest and substantial rights in the results of the research and development venture." *Spellman v. Commissioner,* T.C. Memo. 1986-403, 52 T.C.M. 298, 306-307, 55 P-H Memo T.C. par. 86,403 at 1824 (fn. ref. omitted).[16]

---

[15]Teva was the parent corporation of Sci-Med's general partner, Ikapharm.

[16]We were faced with a similar option in *Moore v. Commissioner,* T.C. Memo. 1989-38, and found that its exercise "was either predetermined or inevitable." However, we scrutinized the

The Seventh Circuit affirmed, not on the basis of the exclusive license agreement, but rather because of the substance of Teva's option to purchase the byproducts of the research. The court posed a hypothetical situation in which Sci-Med financed Teva's research and development in exchange for a royalty interest, stating that such financing would be a capital contribution and not deductible. The court went on to say that:

The only difference between the hypothetical case and our case is that Sci-Med had a prospect of recovering not only royalties but also byproducts, and if that happened and it decided to develop the byproducts rather than sell or license their development to another firm like Teva, it would be in the pharmaceutical business. But this prospect was remote, and not only because Sci-Med presented no evidence that it has, or is likely ever to acquire, a staff, relevant experience, or anything else indicating a likelihood or intention of entering the business. Whatever Sci-Med's desires, Teva's option to acquire for only $20,000 all rights in the byproducts will prevent Sci-Med as a practical matter from ever entering the pharmaceutical business as a result of the venture with Teva. If the byproducts turn out to be worth more than $20,000, Teva will exercise the option and Sci-Med will have no products to make or sell; if the byproducts turn out to be worth less, Sci-Med will have the right to market them but will not exercise the right because the costs would exceed the possible profits. * * * [*Spellman v. Commissioner*, 845 F.2d 148, 150-151 (7th Cir. 1988).]

We think this reasoning is sound and equally applicable to this case. Elco was not required to furnish additional consideration to the project partnership or Robotics, and could exercise the option granted by section 5(a)(iii) at any time. In the exercise of sound business judgment, Elco would surely exercise its right under section 5(a)(iii) if the project was anticipated to be profitable enough to justify incurring the costs of manufacturing and marketing the robot. Elco would already have in place part of the infrastructure necessary for it to pursue those activities, since Elco was itself a high technology firm, and it and/or its subsidiary performed the research and development work. However, should the robot appear to be unprofitable, Elco would decline to exercise its rights under section 5(a)(iii), leaving the project partnership or Robotics with the right to develop an asset whose costs would not appear to

---

transaction therein as a "generic tax shelter," *Rose v. Commissioner*, 88 T.C. 386 (1987), and held for respondent on the basis that it was primarily tax-motivated.

justify additional investment. Absent Elco's participation, neither of these parties would have the necessary infrastructure to undertake to manufacture the robot, although Robotics' general partners, Yaakov and Goldman, had the expertise and contacts necessary to secure the robot's manufacturing and marketing through other channels if it could be done profitably.

We are mindful of the fact that here, unlike *Spellman,* we are not presented with a situation in which petitioner has presented "no evidence that [the Project Partnership or Robotics] has, or is likely ever to acquire, a staff [or] relevant experience." *Spellman v. Commissioner, supra* at 150-151. Robotics' general partners had an abundance of relevant experience, which they could presumably employ to assemble a staff. However, the Seventh Circuit found in *Spellman* that the lack of such resources was not the factor that was fatal to the taxpayer's case, but that "whatever Sci-Med's desires," it would have the opportunity to engage in a trade or business with respect to the byproducts only if it was uneconomical to do so. Taxpayer there, as petitioner here, is prevented from engaging in the particular trade or business either by the law of contracts or the laws of economics.

Petitioner points to Slavitt's testimony concerning his experience with Israeli enterprises and the difficulty they encountered upon attempting to penetrate the U.S. market.[17] From this, petitioner argues that Robotics was to employ its general partners, Goldman and Yaakov, to alleviate similar problems as they might arise in the course of exploiting the robot in the U.S. However, this does not necessarily place Robotics in any trade or business in connection with the robot. Elco had its own plan with respect to Robotics' participation in the exploitation of the robot in the United States, which was to give Robotics an equity interest in any entity incorporated in the United States or Israel subsequent to Elco's exercise of its rights under section 5(a)(iii). According to the Robotics partnership agreement, that corporation was also to have an exclusive

---

[17]While we excluded Slavitt's testimony to the effect that this was a phenomenon common to all Israeli companies, we think that the testimony that was admitted proves essentially the same point, although it is relatively unimportant.

license with respect to the robot.[18] As Robotics would be no more than a shareholder in any such corporation, any marketing activities undertaken by Goldman or Yaakov would necessarily be in the capacity of independent third parties.

Petitioner argues that, notwithstanding the terms of the project partnership agreement, Robotics expected to, and did, take an active role in the management of the Project and promotion of the optic sensing device. Petitioner points out that although they were general partners of the project partnership's limited partner, Goldman and Yaakov were heavily involved in managing and directing the project, and expected to be similarly involved to an even greater extent in the project's later years. Additionally, Slavitt testified that Robotics, through its general partners, was at the time of trial negotiating with a Belgian company for the sale of the robot, and that negotiations were taking place between Robotics and Elco for a sharing of profits apart from the project partnership agreement.

We find petitioner's arguments unpersuasive. First of all, while alteration of the contractual relationship [19] between Robotics and Elco may at some point more closely align Robotics with the trade or business of marketing the robot, there remained the restrictions placed by the Israeli Government upon the robot's exploitation. Under the terms of the chief scientist agreement, only Elco in its independent capacity could obtain any patent with respect to the project, or transfer any patent or technology out of Israel without that Government's permission. Finally, in the event that Elco decided not to exploit the technology, the rights to such technology would pass to the Israeli Government at the end of 7 years after the expiration of the chief scientist agreement, including any extensions.

Any such amendments to the project partnership agreement, even if consummated, cannot alter the position of Robotics in the year before the Court. According to Slavitt's testimony, negotiations for such amendments took place a mere 4 to 5 months prior to trial. Petitioner has not shown that any such alteration in the relationship between

---

[18]See note 9, *supra.*

[19]There was no evidence that any such alteration had been consummated.

Robotics and Elco was contemplated or foreseeable in the years before the Court.[20] Even if such were the case, our decision should be based upon the facts as they existed at the beginning of the transaction, and our analysis should not be based upon hindsight. *Taube v. Commissioner,* 88 T.C. 464, 480 (1987). In the absence of the consummation of any amendment to the project partnership agreement, even hindsight does not afford a view of the facts that is inconsistent with our holding. See *Levin v. Commissioner, supra* at 406 n. 3.

It is a most fundamental principle of tax law that the substance of a transaction controls over its form. While we recognize that "the tax laws affect the shape of every business transaction," *James v. Commissioner,* 87 T.C. 905, 918 (1986), "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory v. Helvering,* 293 U.S. 465, 469 (1935). As the Supreme Court noted in *Snow v. Commissioner,* 416 U.S. 500 (1974), the purpose of the statute was "somewhat to equalize the tax benefits of the ongoing companies and those that are upcoming and about to reach the market." *Snow v. Commissioner, supra* at 504. The purpose of section 174 was not to elevate the status of mere investors in those companies, be they shareholders, limited partners, or otherwise. The substance of the transaction before us is that Elco the independent corporation had complete control over the research and development phase of the project through its subcontracts with the project partnership pursuant to section 5(a)(ii) of the project partnership agreement. Section 5(a)(iii) extended such control to the production and marketing of the robot. Elco left no room for Robotics or any other party to have a say in the affairs of the project. An entity with no control over activities in which it invests is more properly classified as an investor and cannot be engaged in a trade or business in connection with those activities.

---

[20]As stated by the Court of Appeals in *Levin v. Commissioner,* 832 F.2d 403, 406 (7th Cir. 1987), affg. 87 T.C. 698 (1986), "Even a firm that has surrendered by contract all rights to the product * * * may renegotiate the contract; in this sense every investor has the 'potential' to be a manufacturer."

*Other Deductions*

Petitioner contends that Robotics is entitled to deductions for consulting fees paid to Worldtech and IDC, guaranteed payments to partners for management services, and legal fees. Petitioner also contends that Robotics is entitled to amortize its organizational expenses over a 60-month period pursuant to section 709(b). The burden of proof is on petitioner. *Welch v. Helvering,* 290 U.S. 111 (1930).

We find that Robotics is entitled to deduct only a portion of the fees paid to Worldtech and IDC. Robotics made payment in full in 1981 and 1982 for services to be performed by both of these corporations over periods extending past the years in which payment was made. Payment in advance for services to be in the future "results in the creation of an asset" which is to be exhausted ratably over the term for which the payment was made. *Higginbotham-Bailey-Logan Co. v. Commissioner,* 8 B.T.A. 566, 577 (1927). In the case of fees paid to Worldtech, those services were to be rendered over a period of not more than 50 months (November 1981 through December 1985). Robotics is therefore entitled to a deduction equal to 2 percent of such fees for each of the 14 months in which it was in business in 1981 and 1982. Similarly, the services for which IDC was paid in 1981 and 1982 were to be rendered over Robotics' lifetime, which was to run from December 1981 through December 2031, a period of some 50 years. Robotics is therefore entitled to a deduction equal to 2 percent of such fees for each year before the Court.

On its 1981 and 1982 Form 1065 partnership tax returns, Robotics deducted $174,800 and $135,800, respectively, as guaranteed payments to partners. In order for such payments to be deductible under section 707(c), they must meet the requirements of section 162(a). Further,

In determining whether the payments in the present case are deductible under section 162(a), we look to the nature of the services performed by the general partners rather than to their designation or treatment by the partnership. * * * Payments allocable to organizational costs and syndication expenses must be capitalized. Organizational costs, if elected, are amortizable over a 60-month period, but syndication costs are not

amortizable. Secs. 263, 709 * * * [*Durkin v. Commissioner,* 87 T.C. 1329, 1388-1389 (1986).]

Respondent argues that such fees are, in whole or in part, organizational or syndication expenses. The burden of proving what portion of the fees is deductible or amortizable is upon petitioner. *Durkin v. Commissioner, supra* at 1389. However, the record contains little to assist us in determining the purpose for such expenditures. While we believe that some of the management fees paid by Robotics were for ordinary and necessary expenses with respect to its general partners, we are convinced that some of those fees constitute either syndication or organizational expenses or unreasonable compensation. However, we are wholly unable to determine the extent to which the management fees fall into either category. Petitioner has provided us with no basis even to estimate under the rule of *Cohan v. Commissioner,* 39 F.2d 540 (1930), what portion of the guaranteed payments are deductible. See *Conforte v. Commissioner,* 74 T.C. 1160, 1188 (1980), affd. in part, revd. in part, and remanded without discussion of this issue 692 F.2d 587 (9th Cir. 1982). To the extent such fees were for expenses incurred or compensation earned before December 15, 1981, they are nondeductible organization or syndication fees. To the extent that such fees are for management services which are already the subject of the Worldtech and IDC contracts, they are duplicative and therefore constitute unreasonable compensation. While respondent argues for the disallowance of such deductions, he also states that such expenses should be capitalized as either organizational or syndication expenses. As petitioner has not shown that any of such expenses should be amortized pursuant to section 709(b), we agree with respondent that such expenses should be capitalized.

Petitioner deducted his distributive share of Robotics' organizational expenses which Robotics elected to amortize over a 60-month period pursuant to section 709(b). Robotics claimed deductions for these expenses of $1,184 in 1981 and $7,102 in 1982. Respondent asserts that because Robotics was not engaged in a trade or business during the years before the Court, it was not yet entitled to begin amortizing these expenses. Respondent's reliance on *Aboussie v.*

*United States,* 779 F.2d 424 (8th Cir. 1985), in this regard is misplaced. A partnership is not required to be in a trade or business in order to begin business for purposes of section 709. Section 1.709-2(c), Income Tax Regs., states that a partnership "begins business when it starts the business operation for which it was organized." Robotics' business was investing in the project partnership, which it began in December 1981. As Robotics' election to do so was timely and proper, we find that such organizational expenses were properly amortized.

Petitioner also claims as deductions his distributive share of the following expenses of Robotics:

|  | 1981 | 1982 |
|---|---|---|
| Legal fees | $53,533 | - - - |
| Accounting expenses | 285 | $4,000 |
| Office expenses[21] | - - - | 1,039 |

Respondent disallowed these deductions on the grounds that they were either organization fees which may be amortized over 60 months pursuant to section 709 or nondeductible, nonamortizable syndication fees.

Petitioner seeks to allocate the legal expenses between securities advice and tax advice and seeks to introduce into evidence letters from the various counsel who performed those services. Respondent has objected to this correspondence on hearsay grounds. However, it is unnecessary to rule on respondent's objection, since petitioner has not proven that any portion of those fees is allocable to expenses other than for promotion of the sale of partnership interests.

While expenses for advice in connection with the determination, collection, or refund of any tax is generally deductible under section 212(3), section 709 and the regulations thereunder[22] require that all expenses connected with the issuing and marketing of interests in the partnership must be capitalized. Expenses for tax advice fall into that category when the opinion thereby gained is "an integral part of the offering prospectus and was * * * included therein to facilitate the sale of partnership interests."

---

[21]Respondent has not contested petitioner's entitlement to deductions for a distributive share of Robotics' office expenses and is deemed to have conceded the issue.

[22]See sec. 1.709-2(b), Income Tax Regs.

*Surloff v. Commissioner,* 81 T.C. 210, 245 (1983). The tax opinion afforded potential investors in this case was contained in the private placement memorandum itself. Further, the claimed legal expenses were incurred only in 1981, the year Robotics was organized. Finally, petitioner did not produce any time records from those persons or firms rendering legal advice showing with particularity how their time was allocated.[23] Petitioner has therefore not shown that any legal fees were related to matters other than the sale of partnership interests; we therefore find that Robotics' legal fees must be capitalized.

We find that Robotics is entitled to its claimed expenses for accounting fees. The fees are relatively small in amount, and were incurred in both of the years before the Court. They do not strike us as unreasonable when compared with the services required on a year-to-year basis. We find for petitioner on this issue.

Respondent has determined that petitioner is liable for an addition to tax pursuant to section 6659 because of a valuation overstatement. As was the case in *Smith v. Commissioner,* 91 T.C. 733, 766 (1988), "We have disallowed the * * * deductions in issue because we have concluded that the partnerships were not in a trade or business that would support the deductions claimed." Here, the underpayment was not attributable to a valuation overstatement and we therefore find for petitioner on this issue.

Respondent has also determined that petitioner is subject to increased interest pursuant to section 6621(c). That section states that interest shall accrue at the rate of 120 percent of its normal rate with respect to any substantial underpayment attributable to tax-motivated transactions. Such transactions include "any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period." Section 6621(c)(3)(A)(iv); section

---

[23]Petitioner did produce a bill from the law firm which performed the greatest part of the legal work for the transaction. That bill separated the fees into three parts: advice pertaining to tax matters ($45,000), advice pertaining to securities matters ($10,000), and organizational matters ($20,000). This latter category was stated to include services which were clearly syndication costs, such as preparation of the "Offering Memorandum and Investor Subscription Booklet." In the absence of proof to the contrary, we find that any organizational costs included in this category are included in the organizational expenses claimed by Robotics which we have allowed to be amortized over a period of 60 months.

301.6621-2T, Q&A-3(4), Temporary Proced. and Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984), include within that category of tax-motivated transactions "Any deduction disallowed for any period under section 709." We have disallowed all of Robotics' claimed management fees/guaranteed payments and legal fees on the grounds that petitioner has not shown that respondent is incorrect in his determination that such expenses should be capitalized pursuant to section 709. We hereby direct the parties to determine in connection with their Rule 155 computation whether the underpayment attributable to those items exceeds $1,000, thereby constituting a "substantial underpayment attributable to [a] tax motivated transaction" under section 6621(c). If so, increased interest is applicable to that extent.

In accordance with the foregoing,

*Decision will be entered under Rule 155.*