T.C. Memo. 2000-259


UNITED STATES TAX COURT


RESEARCH TWO LIMITED PARTNERSHIP, DENNIS W. TOWNSEND,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 25445-88.                    Filed August 16, 2000.


Daniel S. Goldberg, for petitioner.

Clare J. Brooks and Linda E. Chan, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Chief Judge:  By notice of final partnership administrative adjustment dated July 8, 1988, respondent increased the taxable income of Research Two Limited Partnership (Research II) as follows:

| Year | Amount |
|------|--------|
| 1982 | $2,806,250 |
| 1983 | 233,061 |
| 1984 | 148,897 |

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issue we must decide is whether Research II was entitled to deduct for its 1982 taxable year certain amounts owed to CemCom Research Associates, Inc. (CemCom), for research and development services.[1]

## FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case.

---

[1] In their briefs the parties appear to pose a second issue of whether Research II is entitled to miscellaneous deductions of $56,250, $233,061, and $174,828 for taxable years 1982, 1983, and 1984, respectively. Petitioner, however, presented almost no argument on that issue. Rather, petitioner states that, if the Court finds that Research II is not engaged in a trade or business, the Court should allow Research II to amortize those expenses as organizational expenses under sec. 709(b). Respondent argues that Research II is not engaged in a trade or business but also states that Research II is entitled to amortize the organizational expenses under sec. 709(b). As there appears to be no dispute over the issue, we will address only the sec. 174 research and development deduction.

At the time the petition in this case was filed, Research II was a limited partnership with its principal place of business in Towson, Maryland. Petitioner, Dennis W. Townsend, Research II's tax matter partner, resides in Towson, Maryland.

Research II was formed on December 29, 1982. The general partners of Research II are Dennis W. Townsend and Townsend & Co., Inc. They collectively own a 1.01-percent interest in Research II. The remaining interests in Research II are owned by 32 limited partners. Research II maintains its books and records and files its Federal income tax returns on the accrual method of accounting. Research II has a calendar year.

Before its formation as a limited partnership and in connection with obtaining funds, Research II issued a confidential memorandum which described Research II's proposed purpose as the development of advanced cementitious composite technology for application in the heat treatment and ceramic industries (new technology). The confidential memorandum explained that Research II would attempt to achieve its purpose by engaging CemCom[2] to perform research and development work on behalf of the partnership. The confidential memorandum states that, in engaging CemCom, the promoters of Research II anticipated that the new technology could be used in

---

[2]  Cemcom was a research corporation formed in 1981 to research further development and applications of cementitious composites.

constructing a room-temperature castable ceramic cement that would maintain exact tolerances and physical integrity in the 2,000 degree Fahrenheit range. Promoters of Research II also foresaw application of the new technology in making a high-temperature cementitious ceramic.

Pursuant to the limited partnership agreement dated December 29, 1982, each limited partner was required to make capital contributions to Research II of the following amounts: (1) A cash payment of $24,500 for each unit held, for an aggregate amount of $1,225,000, due upon formation of Research II; (2) a cash payment of $6,500 for each unit held, for an aggregate amount of $325,000, on October 15, 1983; (3) a cash payment of $5,500 per unit held, for an aggregate amount of $275,000, on December 15, 1983; and (4) an additional cash contribution of up to $24,000, plus recourse interest for each unit held, up to an aggregate of $1,200,000, plus recourse interest for all partners, at the call of the general partners, to the extent that Research II had insufficient funds to pay the deferred obligation under the research and development agreement with CemCom.

On December 29, 1982, Research II and CemCom entered into a research and development agreement. Pursuant to the terms of the research and development agreement, CemCom undertook to perform certain research tasks and experimental services on

behalf of Research II for the purpose of developing and perfecting the new technology and associated patentable and nonpatentable inventions, know-how, and trade secrets. All property rights in the new technology and all items of new technology were to be the sole and exclusive property of Research II.

In consideration of CemCom's performing research and experimental services on behalf of Research II, the research and development agreement provided that Research II was obligated to pay CemCom $2,750,000, plus interest at an annual rate of 10 percent of the unpaid balance. Payments were to be made as follows: (1) $950,000 in cash upon execution of the research and development agreement; and (b) $1,800,000 in a promissory note. Payments under the promissory note were to be made as follows: (1) $325,000 of principal payable on November 1, 1983; (2) $275,000 of principal payable on January 3, 1984; and (3) $1,200,000 plus all accrued and unpaid interest at the annual rate of 10 percent (totaling $294,583.33) payable on December 31, 1984. All such payments were with recourse to Research II and its partners.

The research and development agreement also provided that Research II could notify CemCom on or before December 31, 1984, and the $1,494,583.33 could be restated as principal and amortized at 14 percent per year in nine consecutive semiannual

payments of $229,398.32 each, with the first payment due on June 30, 1985. If Research II elected that option, any interest accrued on the unpaid balance after December 31, 1984, was without recourse to any partner. Moreover, if there were insufficient funds within Research II to make the semiannual payments, payment could be deferred until June 30, 1989. If Research II failed to pay by June 30, 1989, Research II would be in default under the research and development agreement, and CemCom could exercise its rights as a creditor against Research II and its limited partners.

On December 29, 1982, Research II and CemCom entered into a technology transfer agreement. Pursuant to the terms of the technology transfer agreement, Research II licensed, on a nonexclusive basis, the rights to certain technology from CemCom. Research II also entered into a license agreement with Research I Limited Partnership (Research I).[3] The CemCom licenses enabled Research II to use all proprietary information of CemCom and Research I necessary to proceed with the research and development activities required under the research and development agreement.

The technology transfer agreement also granted CemCom the option, exercisable between June 30 and July 31, 1984, to enter

---

[3]    Research I Limited Partnership is also a Maryland limited partnership in which Dennis Townsend and Townsend & Co., Inc., are general partners.

into an exclusive perpetual license of the new technology if the
new technology was patentable.  If CemCom chose to exercise that
option, it would be obligated to make a series of annual royalty
payments (minimum royalty payments) based upon a percentage of
CemCom's cumulative gross revenues but at least $10,950,000.
The payments were due at the following intervals:

| Date | Minimum Payment |
|------|-----------------|
| 12/31/84 | $430,000 |
| 6/30/85 | 430,000 |
| 12/31/85 | 430,000 |
| 6/30/86 | 455,000 |
| 12/31/86 | 455,000 |
| 6/30/87 | 480,000 |
| 12/31/87 | 480,000 |
| 6/30/88 | 505,000 |
| 12/31/88 | 505,000 |
| 6/30/89 | 300,000 |
| 12/31/89 | 300,000 |
| 6/30/90 | 325,000 |
| 12/31/90 | 325,000 |
| 6/30/91 | 350,000 |
| 12/31/91 | 350,000 |
| 6/30/92 | 375,000 |
| 12/31/92 | 375,000 |
| 6/30/93 | 400,000 |
| 12/31/93 | 400,000 |
| 6/30/94 | 425,000 |
| 12/31/94 | 425,000 |
| 6/30/95 | 450,000 |
| 12/31/95 | 450,000 |
| 6/30/96 | 475,000 |
| 12/31/96 | 475,000 |
| 6/30/97 | 500,000 |
| 12/31/97 | 500,000 |

If the actual computation of the royalty was greater than
the minimum royalty payments, CemCom would be obligated to make
greater royalty payments.  If the new technology was not

patentable, the due dates for the minimum royalty payments owed to Research II by CemCom would be adjusted to reflect the date of the exercise of the exclusive license. In order for CemCom to ascertain the applicability of the new technology to CemCom's product line and to facilitate its decision as to whether to exercise the option, the technology transfer agreement provided CemCom with a "review license" from December 29, 1982, through June 30, 1984, to use, review, and evaluate each item of new technology.

If CemCom exercised its option for the exclusive license, the royalty arrangement would provide Research II with a profit equal to the difference between the minimum royalty payments and its deferred obligation to CemCom. CemCom, however, was under no obligation to exercise its option while Research II was unconditionally liable to CemCom for the payment of its deferred obligation.

If CemCom chose not to exercise its option, the technology transfer agreement obligated CemCom to grant Research II a nonexclusive perpetual license of the old technology and the Research I technology necessary and useful in the further development, manufacture, use, or marketing of the new technology. In return for the license, Research II would pay

CemCom a 5-percent annual royalty on all gross revenues from the sales or licensing of the new technology.

Before the formation of Research II during 1982, Mr. Townsend and Townsend & Co., Inc., were the general partners of Research I limited partnership. Research I was organized on December 31, 1981, and was likewise engaged in research and development in the area of cementitious composites. Research I also engaged CemCom to provide the actual research and development services. Pursuant to an agreement between Research I and CemCom, CemCom was granted the option to license the technology it developed on behalf of Research I provided that it paid Research I minimum royalty payments. Deductions taken by the various limited partners of Research I were the subject of Harris v. Commissioner, T.C. Memo. 1990-80, affd. 16 F.3d 75 (5th Cir. 1994), affd. without published opinion sub nom. Travers v. Commissioner, 21 F.3d 424 (4th Cir. 1994), which denied Research I a deduction pursuant to section 174(a)(1) for amounts paid to CemCom for research and development services.

During 1982, CemCom approached Mr. Townsend with a proposal for a new research venture. Mr. Townsend was reluctant to organize a second partnership absent assurance by CemCom that it would exercise its option under its agreement with Research I. On December 29, 1982, the same day as the formation of Research II, CemCom and Research I entered into an agreement whereby

CemCom agreed to exercise its option to license the technology being developed by Research I.  Consequently, on December 29, 1982, Mr. Townsend believed that CemCom had bound itself to make substantial minimum royalty payments to Research I.

Accordingly, as of December 29, 1982, it was not certain that CemCom would exercise its option under the technology transfer agreement with Research II to license the new technology.  Additionally, the exercise of the option was unlikely, given the amount of minimum royalties that CemCom owed under the Research I agreement.  Even if CemCom were to exercise its option, CemCom would not be able to continue making the minimum royalty payments for any sustained period.

During 1983 and 1984, research and development work was performed by CemCom in creating and developing the new technology on behalf of Research II.  During that time, CemCom provided Mr. Townsend with financial statements and progress reports detailing CemCom's research and experimental projects and activities.  The Research II limited partners were kept advised on CemCom's progress by a series of bulletins.  The research performed by CemCom during 1983 and 1984 resulted in the creation and development of "Jetfix".

On July 31, 1984, CemCom's option to license the new technology pursuant to the technology transfer agreement lapsed. On September 27, 1984, Research II and CemCom entered into a

- 11 -

licensing agreement (1984 licensing agreement) which granted

CemCom the exclusive right and perpetual worldwide license to

the new technology.  The 1984 licensing agreement provided a

royalty rate to Research II at less than the rate provided in

the technology transfer agreement and provided for minimum

royalties as follows:

| | |
|---|---|
| Within 90 days | $12,000 |
| 6/30/85 | 285,000 |
| 1/01/86 | 285,000 |
| 6/30/86 | 285,000 |
| 1/01/87 | 285,000 |
| 6/30/87 | 285,000 |
| 1/01/88 | 285,000 |
| 6/30/88 | 285,000 |
| 1/01/89 | 285,000 |
| 6/30/89 | 285,000 |

The revised royalty arrangement enabled Research II to

maintain a profit potential, at a minimum, equal to the

difference between the minimum royalties and the deferred

obligation to CemCom.

Also, on September 27, 1984, Research II and CemCom entered

into a first amendment to the research and development agreement

which provided that both parties had fully complied with all

requirements of the research and development agreement and that

the new technology had reached the stage where further

development would no longer qualify as research and development

under section 174.  The first amendment further canceled

CemCom's agreement not to do research within the specific scope

and definition of the research program for other parties.

Additionally, the first amendment altered the amortized payments if Research II exercised its option to restate principal as follows:

| | |
|---|---|
| 6/30/85 | $229,398.32 |
| 1/01/86 | 229,398.32 |
| 6/30/86 | 229,398.32 |
| 1/01/87 | 229,398.32 |
| 6/30/87 | 229,398.32 |
| 1/01/88 | 229,398.32 |
| 6/30/88 | 229,398.32 |
| 1/01/89 | 229,398.32 |
| 6/30/89 | 229,398.32 |

On the next day, September 28, 1984, Research II entered into an exercise of stock agreement to purchase and purchased 7 percent of the stock of CemCom for $13,000. The stock purchase was part of an overall series of stock purchases pursuant to which Research I, Research II, Mr. Townsend, and another partner in both Research I and Research II acquired over 50 percent of the stock and voting control of CemCom.

On December 31, 1984, Research II elected to restate the amount due under the research and development agreement as principal. On February 6, 1985, Research II and CemCom entered into a second amendment to the research and development agreement reflecting Research II's election to restate the principal amount due.

On its Federal income tax return for 1982, Research II claimed a $2,806,250 loss consisting of a research and development expense of $2,750,000 and miscellaneous expenses of

$56,250. On its Federal income tax return for 1983, Research II claimed a $231,432.45 loss consisting of $1,628.83 of dividend income and miscellaneous expenses of $233,061.28. On its Federal income tax return for 1984, Research II claimed a $174,571.15 loss consisting of $257.18 of dividend income and miscellaneous expenses of $174,828.33. By notice of final partnership administrative adjustment dated July 8, 1988, respondent denied Research II's deductions for the years in issue but allowed Research II a deduction of $25,931 for amortization of patents in 1984. Respondent has stipulated that Research II was entitled pursuant to section 709(b) to deduct amortization of organizational fees of $1,250 for 1982.

OPINION

The issue we must decide is whether Research II is entitled to a deduction, pursuant to section 174(a)(1), for the $2,750,000 debt it incurred to CemCom during 1982. Section 174(a)(1) provides:

SEC. 174(a). Treatment as Expenses.--

(1) In general.--A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

The parties agree that the $2,750,000 debt related to research or experimentation falls within the scope of section 174. Respondent contends, however, that the debt was not

incurred by Research II in connection with its trade or business.

In Snow v. Commissioner, 416 U.S. 500, 502 (1974), the Supreme Court compared the "in connection" language of section 174 with the "in carrying on" language of section 162[4] and established that a business need not currently produce or sell any product in order to obtain a deduction for research or experimental expenditures.  Rather, the Supreme Court reasoned that the policy behind section 174, which is to aid "small or pioneering business enterprises" as well as more established ones, calls for a more relaxed "trade or business requirement" than applies to section 162.  Id. at 503-504.

In Green v. Commissioner, 83 T.C. 667, 671-672 (1984), a deduction pursuant to section 174 was claimed by a partnership that entered into a research and development agreement with a research corporation and on the same day, through the grant of an exclusive license, divested itself of all ownership rights to the inventions to be produced.  We held that Snow "did not eliminate the 'trade or business' requirement of section 174 altogether" and denied the partnership the deduction.  Id. at

---

[4]    Sec. 162(a) provides:

    SEC. 174(a).  In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *.

686-687. We explained that the partnership was acting merely as an investor and not as the type of business that section 174 intended to promote. See id. at 687.

In Diamond v. Commissioner, 92 T.C. 423, 424 (1989), affd. 930 F.2d 372 (4th Cir. 1991), the taxpayer was a limited partner in a limited partnership that became a limited partner in another limited partnership (project partnership). The general partner in the project partnership was a publicly held corporation that was involved in robotics technology. See id. Pursuant to the project partnership agreement, the corporation was required to contribute the rights to its technology to the project partnership and to pursue further research activities on behalf of the project partnership. See id. at 427-428. In return, the partners in the project partnership were to contribute certain sums of money. See id. at 428. The corporation was granted an option, exercisable in its sole discretion at any time, to acquire an exclusive and irrevocable license to carry out all production, manufacturing, and marketing of any product developed under the agreement. See id. at 428-429. This Court held that there was no realistic prospect, during the year in issue, that the technology to be developed "would ever be exploited in any trade or business carried on by anyone other than * * * [the corporation]." Id. at 439. In that regard, we reasoned that, if the technology

- 16 -

appeared commercially promising, the corporation would definitely exercise its option, and, if the corporation declined to exercise the option, the project partnership and the limited partnership would be left with the right to develop an asset whose costs would not appear to justify additional investment. See id. at 440-441.

The Court of Appeals for the Fourth Circuit affirmed our opinion, stating:

> The question is not whether it is possible in principle, or by further contract, for these partnerships to engage in a trade or business, but whether, in reality, the project partnership * * * possessed the capability in the years before the court to enter into a new trade or business in connection with the proposed * * * [technology].  The answer to the question of reality must be found in economic reality, which is revealed more by the direction of the money than by the complexion of the principle. [Diamond v. Commissioner, 930 F.2d at 375.]

In Harris v. Commissioner, T.C. Memo. 1990-80, we held that Research I, a partnership of which Mr. Townsend was a general partner, was not entitled to deductions under section 174 for amounts paid to CemCom for research and development services which are similar to the research and development services provided by CemCom to Research II under the terms of the research and development agreement.  Research I and CemCom had also entered into an agreement, similar to the technology transfer agreement between Research II and CemCom, under which CemCom was granted the option to license the technology it

developed for Research I subject to high minimum royalty payments. We found that, at the time Research I entered into an agreement with CemCom in 1981, Mr. Townsend, as Research I's general partner, did not intend ever to enter into any business regarding the technology. Rather, we found that it was Mr. Townsend's intention that CemCom would exercise the option as written or the parties would renegotiate the amount of the minimum royalties. In reaching that conclusion, we relied on the fact that the Research I offering memorandum made no mention of any other options except CemCom's exercise of the option. We also relied on the testimony of Mr. Townsend and others that the intent of the partners in Research I was that CemCom would exercise its option.

Petitioner has not shown that the facts surrounding Research II are materially different from those surrounding Research I. Like the confidential memorandum issued to prospective limited partners in Research I, the confidential memorandum issued to the Research II partners contains neither specific plans nor economic forecasts related to the possibility that Research II might itself engage in the marketing of the new technology. Similarly, no mention is made in the Research II memorandum of hiring a staff experienced in the area or of acquiring real or personal property for such purposes. Finally, as in Research I, virtually all of the funds of Research II were

to be disbursed in payment of the licensing agreement to CemCom, and the limited partners of Research II were under no obligation to contribute additional funds for that purpose. These facts indicate that Research II never intended to enter a trade or business in connection with the new technology.

Petitioner argues that the instant case is distinguishable from Harris v. Commissioner, supra, because the high minimum royalties required by the technology transfer agreement in addition to the royalties which CemCom owed under the Research I agreement made it virtually certain that CemCom would never exercise its option under the Research II agreement to license the new technology. However, as we said in Harris: "the amount of the royalties does not supply the required prospect of a 'trade or business' to be carried out by the Partnership."

Petitioner further argues that the fact that Research I, Research II, Mr. Townsend, and another partner in both Research I and Research II ultimately acquired control of CemCom is evidence of the Research II's intent to engage in a trade or business. To the contrary, such evidence convinces us that, even when CemCom was unable to license the new technology, Research II did not take advantage of the opportunity to enter into a trade or business with the new technology. Instead, the minimum royalties were reduced, and CemCom, with its new owners, remained the vehicle through which the actual trade or business involving the new technology was operated.

In sum, we hold that the research and developmental expenses incurred by Research II during December 1982 were not made in connection with its trade or business within the meaning of section 174(a).  We have considered the parties' remaining arguments and find them without merit, irrelevant, or unnecessary to reach.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.