UNITED FIBERTECH, LTD., KEVIN T. TWOHY, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
United Fibertech, Ltd. v. Commissioner
Docket No. 32531-88
United States Tax Court
T.C. Memo 1991-445; 1991 Tax Ct. Memo LEXIS 494; 62 T.C.M. (CCH) 699; T.C.M. (RIA) 91445; September 10, 1991, Filed *494 Decision will be entered for the respondent. Robert B. Martin, Jr., for the petitioner. Donna F. Herbert, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined an adjustment to the partnership return of income of United Fibertech, Ltd. (hereinafter sometimes referred to as the partnership) for the tax year ended December 31, 1983, due to disallowance of a deduction for Research and Experimental Expense in the amount of $ 2,280,000. The issues for decision are: (1) Whether purported research and experimental expenditures paid by the partnership during 1983 were paid in connection with a trade or business, in accordance with section 174; [1] and if so (2) what portion of the expenditures, if any, qualifies as research and experimental expenditures under section 1.174-2(a)(1), Income Tax Regs.
*495 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, together with attached exhibits, is incorporated herein by this reference. Petitioner is the tax matters partner (TMP) of United Fibertech, Ltd., a limited partnership organized and existing under the laws of the State of California. The partnership's principal place of business was in Fairfield, Iowa, at the time the petition in this case was filed. Petitioner resided in Fairfield, Iowa, at the time the petition was filed. A. Background
The partnership was formed on November 2, 1983. Its principal business, [2] according to the limited partnership agreement, was "to enter into a research and development agreement * * * for the development of fused fiberboard, fused fiberboard production technology, and building systems incorporating fused fiberboard." Fused fiberboard is a panelized building material made from a dry stripped crude fiber such as straw, cotton rubble, or sugar cane waste which has been compacted into a dense sheet and covered with a surfacing material such as a heavy paper. *496 Fused fiberboard technology was at least partially developed by Tetratech Fiber Processing, Ltd., a Canadian corporation (Tetratech of Canada). Principals of Tetratech of Canada produced a machine known as the Series 100 Mill (Mill). They procured a United States patent for the technology. However, the Mill was cumbersome and the fused fiberboard it produced was not marketable. The Mill needed to be upgraded in order to produce commercially viable fused fiberboard. As part of the plan to upgrade the Mill and market the fused fiberboard, principals in Tetratech of Canada formed Tetratech Building Systems International, Inc., a Texas corporation (TBSI), in April 1983. Tetratech of Canada granted an exclusive license to TBSI to market the Mill and the fused fiberboard in the United States, Mexico, the Caribbean, Central and South America, Japan, Korea, the other Pacific Rim countries, India, Australia, and New Zealand. TBSI chose Texas as the site for the project because that market was growing faster than the market in Canada. Moreover, the location in Texas enabled TBSI to develop a better distribution network so as to service the areas in which it was granted an exclusive *497 license by Tetratech of Canada. TBSI agreed to pay Tetratech of Canada $ 200,000 for the licensing rights; $ 190,000 for consulting services relating to assembly of the Mill; and $ 1,600,000 for the Mill itself, payable in four annual installments with interest at 15 percent. TBSI paid the first installment in September 1983; the Mill was set up at TBSI's facility in Texas in the Fall of 1983. B. Formation of United Fibertech, Ltd.
Finding itself in need of capital to operate the mill and develop the technology, TBSI negotiated with United Investment Groups, Inc. (UIG) to syndicate a limited partnership. UIG in turn created and syndicated United Fibertech, Ltd. during 1983. The principals of UIG were not engineers or architects, and had no experience with fused fiberboard technology. Instead, they relied on attorneys and other nonengineers to evaluate the proposal. The principals of UIG, TBSI, and the partnership considered the partnership's role to be that of a financier, while TBSI's role was to develop the technology and operate the Mill. Clyde Cleveland, president of UIG and one of the partnership's general partners, sat on TBSI's board of directors. However, he *498 played no significant role in the management of TBSI, and his only job on TBSI's board was monitoring the partnership's investment. The partnership and TBSI entered into a "Research and Development Agreement" and a "Technology Transfer Agreement" on October 31, 1983. The Research and Development Agreement stated that TBSI would perform research and experimental services in an experimental or laboratory sense, in accordance with section 174 and section 1.174-2, Income Tax Regs. The results of the research were to be the sole property of the partnership. TBSI was to be paid between $ 1,140,000 and $ 2,280,000 for this service; the amount of research to be performed was dependent on the amount paid by the partnership, which was itself dependent upon the amount of capital UIG raised from the partnership's limited partners. TBSI granted a non-exclusive license to the partnership for use in the research process of the then-existing technology. In return, the partnership promised to pay a royalty to TBSI based on the appraised value of this non-exclusive license. The Research and Development Agreement required TBSI to provide the partnership with quarterly reports describing its progress. *499 However, the agreement explicitly stated that TBSI was to be the sole determinant of the detailed manner and methods used in the research process, and that the partnership was interested only in the results of the research. Through the Technology Transfer Agreement, the partnership granted an option to TBSI to purchase an exclusive worldwide license for the results of TBSI's research. The price for this option was $ 100. The partnership established such a low cost so as to assure that TBSI would exercise the option. In consideration for this exclusive worldwide license, TBSI was required to pay the partnership a royalty based on TBSI's sales of the product. TBSI also agreed that in consideration for the exclusive worldwide license, it would use its best efforts to market the product. After the partnership would have received royalties from TBSI equal to 500 percent of the amount contributed to it by its limited partners, the partnership, at its sole discretion, could have elected to forgo future royalty payments and receive instead up to 25 percent of TBSI's common stock. Together, these two agreements provided for the partnership to pay TBSI up to $ 2,280,000 for TBSI to *500 perform research and experimental services, and that for a fee of $ 100, plus royalties on future sales of fused fiberboard, if any, TBSI was to manufacture and market the product. Moreover, the partnership could convert its position to that of a shareholder in TBSI, with no assurances that any management authority would be delegated to petitioner. UIG was successful in raising $ 2,800,000 for the partnership, of which the partnership paid $ 2,280,000 to TBSI in December 1983. UIG represented to potential limited partners that they would receive a tax deduction in the year of their investment of approximately 80 percent of the amount contributed to the limited partnership. UIG also advised potential investors of the risks inherent in the investment, including the possibility that TBSI could elect not to exercise its option to acquire the license. The Confidential Private Placement Memorandum stated that in that event, the Partnership would be forced to market the results itself. The general partners are not experienced in the manufacture and marketing of fused fiberboard and fused fiberboard production technology, and it is unlikely that they would be able to engage in these *501 activities on a profitable basis.
C. TBSI's Research and Development Activities and the New Plan
In 1983, TBSI began the research and experimental program to develop a new mill to produce the fused fiberboard. Almost from the beginning, TBSI experienced financial difficulties. It reported losses of $ 600,555, $ 637,492 and $ 762,825 during the fiscal years ended November 30, 1983, 1984, and 1985, respectively. Due to these difficulties, TBSI could not have effectively marketed the product in accordance with the best efforts clause of the Technology Transfer Agreement. TBSI therefore did not exercise its option for the exclusive worldwide license from petitioner. At no time did the partnership's general partners consider using the results of TBSI's research itself to manufacture or market the product. Instead, the partnership's general partners entered into negotiations with TBSI's creditors and shareholders, with Mansion Industries, Inc. (Mansion), a publicly traded corporation, and with the partnership's limited partners. The general partners arranged with Mansion for TBSI's shareholders to exchange their TBSI stock for Mansion stock. Mansion then entered into a *502 Technology License Agreement with the partnership on April 11, 1985, for an exclusive worldwide license of the results of TBSI's research. The partnership was to be paid royalties by Mansion, and also had an option to receive Mansion stock in lieu of royalty payments. The Technology License Agreement gave no authority to the partnership to manufacture or market any fused fiberboard. The partnership was simply to receive royalties or stock in Mansion based on sale of fused fiberboard by Mansion. The partnership invested no additional funds in the new manufacturing or marketing plan for the fused fiberboard. Up until the time of trial, Mansion had invested $ 3,000,000 in additional modifications to the Mill and in getting the product to market. However, Mansion had generated no revenue from the sale of fused fiberboard. [3]
*503 OPINION A. Expenditure Must be in Connection with a Trade or Business
The deductibility of research and experimental expenditures is governed by section 174.[4]Section 174 requires expenditures be "in connection with * * * [the taxpayer's] trade or business." In Snow v. Commissioner, 416 U.S. 500, 40 L. Ed. 2d 336, 94 S. Ct. 1876 (1974), the Supreme Court held that the taxpayer need not currently produce or sell any product in order to obtain a deduction for research and experimental expenditures. The Supreme Court reasoned that the policy behind section 174, to aid small or pioneering business enterprises as well as more established ones, called for a more relaxed trade or business requirement under section 174 than applied to section 162.[5]Snow v. Commissioner, 416 U.S. at 503. *504 However, the Supreme Court did not mean for the "trade or business" requirement to be completely eliminated. As we said in Green v. Commissioner, 83 T.C. 667 (1984), the Supreme Court in Snow
did not eliminate the "trade or business" requirement of section 174 altogether. For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section. [Green v. Commissioner, 83 T.C. at 686-687. Emphasis in original; fn. ref. and citations omitted.]
In Green v. Commissioner, supra, we held that a limited partnership, LaSala, that financed the research and development of four inventions, but retained no control over the manufacturing or marketing of such inventions, was not conducting research "in connection with" a trade or business for purposes of section 174. The limited partnership was formed merely to acquire and invest in the four inventions. *505 Immediately after the acquisition, LaSala granted an exclusive, worldwide license to an unrelated party to manufacture and market the product, in return for royalty payments based on sales of the invention. We found that LaSala "functioned only as a vehicle for injecting risk capital into the development and commercialization of the four inventions. Its activities never surpassed those of an investor. It was not the up-and-coming business which section 174 is intended to promote." 83 T.C. at 687 (emphasis in original). The facts and circumstances approach will be used to determine whether the claimed research and development expenditure is in connection with a trade or business. Green v. Commissioner, 83 T.C. at 687. Accordingly, the courts have scrutinized claimed research and development expenditures to sort out legitimate expenditures from those designed to shelter the income of passive investors. Spellman v. Commissioner, 845 F.2d 148, 151 (7th Cir. 1988), affg. a Memorandum Opinion of this Court; Diamond v. Commissioner, 92 T.C. 423 (1989), affd. 930 F.2d 372 (4th Cir. 1991). *506 The partnership was not in the trade or business of manufacturing or marketing fused fiberboard, but was merely formed to invest in the technology, in the hopes of receiving unearned income (royalties) from its investment. The general partners had no expertise whatsoever in fused fiberboard technology, and in fact had never even heard of it before their association with Tetratech of Canada and TBSI. Their syndication and management of real estate limited partnerships represent their closest association with any building material, let alone fused fiberboard. In the general partners' evaluation of the investment, they consulted with attorneys, financial consultants, and other nonengineers. The purpose of such consultations was merely to get information to present to potential limited partners. If they truly looked at their role as entrepreneurs in a trade or business and not merely as investors, they would have consulted engineers and architects and not relied on the representations of TBSI. B. Entitlement to or Potential Use of Research Results
In Levin v. Commissioner, 832 F.2d 403, 406-407 (7th Cir. 1987), affg. 87 T.C. 698 (1986), *507 the Court found that mere legal entitlement to the results of the research is not dispositive of the nature of the agreement, and does not establish an activity to be a trade or business. Levin involved a partnership used to finance new projects of a food processing equipment manufacturer. The partnership ostensibly owned the results of the research, and in return for royalty payments, licensed them to the manufacturing company on an exclusive, worldwide basis. Contrary to the taxpayer in Green, the partnership in Levin did not completely give up control over the results of the research; instead They were entitled to buy and stock completed machines for resale (though they were not obliged to do so); they were supposed to receive collateral technology developed in the course of developing the food machines, and presumably they could have used this technology to develop and market other machines * * *.
Levin v. Commissioner, 832 F.2d at 406. This level of involvement by the taxpayer was less than was contemplated by Snow, but exceeded the amount extant in Green. The taxpayers argued that this "'potential' for entering the manufacturing *508 and selling end of the business is enough to classify the * * * [research and development] as part of the partnership's trade or business." Levin v. Commissioner, 832 F.2d at 406. However, the Court disagreed and stated The legal entitlement must be backed by a probability of the firm's going into business. This ordinarily will be so only when it is in the venture's private interest to manufacture and sell any products that the development effort produces. The taxpayers did not offer to prove that it would have been rational for the partnerships to do so; they did not attempt to show the anticipated value of the collateral technology to which the partnership would acquire legal rights (though surely people knowledgeable about food machinery could have offered evidence about the usual value of technology rights in that business); the taxpayers rested on the demonstration that the partnerships had the bare legal entitlement to stock and sell the machines and go into business using any technology they acquired.
Levin v. Commissioner, 832 F.2d at 407. Agreements similar to those in Levin were used by the taxpayers in Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), *509 affg. a Memorandum Opinion of this Court. There, the taxpayer invested in a limited partnership that itself invested in a company called Sci-Med. Sci-Med was to enter into a research and development agreement with a large foreign pharmaceutical company to develop new antibiotics. The pharmaceutical company was to have exclusive worldwide rights to manufacture, sell, and license the results of the research and development project. Moreover, the pharmaceutical company was given the option to purchase any by-products of the research from Sci-Med for $ 20,000. During the development period, Sci-Med retained all rights to the results. The Court characterized this reservation of rights as giving "Sci-Med additional assets, [but] it would no more put it in the pharmaceutical business than foreclosing on a real estate mortgage would make a bank a real estate company." Spellman v. Commissioner, 845 F.2d at 150. The fact that Sci-Med gave the pharmaceutical company exclusive rights to manufacture and sell the results of the research convinced the court that Sci-Med's role was "that of an investor rather than that of an entrepreneur * * * and 'the management of investments *510 is not a trade or business' for purposes of section 174." Spellman v. Commissioner, 845 F.2d at 150 (citing Green v. Commissioner, 83 T.C. 667, 688 (1984). Further, the possibility that the pharmaceutical company would not exercise the option to acquire rights to the byproducts was not enough to place Sci-Med in the pharmaceutical business. The possibility was only remote, and Sci-Med presented no evidence that it had, or was "likely ever to acquire a staff, relevant experience, or anything else indicating a likelihood or intention of entering the business." Spellman v. Commissioner, 845 F.2d at 150-151. In Property Growth Company v. Commissioner, T.C. Memo 1988-258, affd. without published opinion 889 F.2d 1090 (8th Cir. 1989) we determined that the combination of (1) a research contract and (2) an option arrangement exercisable by the research contractor at no cost other than a 10-percent royalty on future sales, gave the research contractor effective control over the research project. This precluded the taxpayer from entering the trade or business. In fact, we deemed the partnership's *511 sole role in that case as the contribution of capital in exchange for a royalty interest, and we found that the terms of the option belied the taxpayer's claim that the partnership actually owned the technology being developed. In the present case the partnership's rights to the results of the research constitute a mere legal entitlement. Not only were the general partners not engineers or architects, but they had no engineers or architects on their staff. Moreover, they had no plans to hire any employees with such training. Therefore, there was no reasonable prospect that the partnership could have entered the trade or business of manufacturing or marketing the product. The Limited Partnership Agreement stated that the limited partners could not be required to contribute additional capital to the partnership. Given that everyone involved with this project was well aware that a substantial amount of money would be needed to bring the product to market, the provision excluding the partnership's partners from any future obligations confirms the fact that the partnership viewed the manufacturing and marketing of fused fiberboard as someone else's opportunity. C. Option to Acquire *512 License to Results of Research
The question of whether the granting of an option to acquire a license would enable the potential licensor to deduct the research and development fees under section 174 was addressed in Diamond v. Commissioner, 92 T.C. 423 (1989), affd. 930 F.2d 372 (4th Cir. 1991). The taxpayer in Diamond argued that the option represented only a possibility that the licensee would acquire the license, and because the licensee had no obligation to acquire the license, the door was open for the taxpayer to exploit the results of the research. However, after considering that the option at issue could have been exercised for a nominal amount, we concluded that the taxpayer was "prevented from engaging in the particular trade or business either by the law of contracts or the laws of economics." Diamond v. Commissioner, 92 T.C. at 441. In Alexander v. Commissioner, T.C. Memo 1990-141, we followed the reasoning in Diamond, and found that because the options could have been exercised for nominal amounts "the marketing companies (as optionees) would surely exercise the options if anticipated *513 profits * * * exceeded the option prices, and would decline to exercise the options if anticipated profits were less than the option prices." Alexander v. Commissioner, supra.In other words, we found "no realistic prospect" that the taxpayer would be in the trade or business of marketing the results of the research. Alexander v. Commissioner, supra, citing Diamond v. Commissioner, 92 T.C. at 439. See also Kanter v. Commissioner, T.C. Memo 1990-380 (on appeal 9th Cir., July 15, 1991) (even though the taxpayer possessed the expertise to exploit the results of research done by another, no realistic prospect existed that the taxpayer would ever be in the trade or business). Petitioner argues that TBSI's failure to exercise its option implies that a realistic prospect existed for the partnership to enter the trade or business of manufacturing and marketing the product. The fact that TBSI did not exercise its option cannot be used to retroactively imply that the partnership was in the business of manufacturing or marketing the technology. "[Our] decision should be based upon the facts as they *514 existed at the beginning of the transaction, and our analysis should not be based on hindsight." Diamond v. Commissioner, 92 T.C. at 443 (citation omitted). See also King v. United States, 545 F.2d 700, 709 (10th Cir. 1976); Smith v. Commissioner, 78 T.C. 350, 392 n.32 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987). Next, petitioner argues that because TBSI was a start-up organization and it would have been obligated to spend millions of dollars to satisfy the best efforts clause of the Technology Transfer Agreement, the probability existed that the partnership was to be left with the job of manufacturing and marketing the product. The facts as they existed at the beginning of the transaction clearly show that the partnership's partners always intended that TBSI would exercise the option; that is why the option price was set at only $ 100. Additionally, the partnership never possessed the expertise to exploit the technology. After it was faced with the reality that TBSI was not going to manufacture and market the product, the partnership did not try to acquire a staff to do so. *515 Instead, the general partners searched for additional financing for TBSI, and when those efforts failed, they searched for a successor to TBSI to exploit the technology. The partnership found Mansion. At no time did the partnership entertain the idea of manufacturing or marketing the product. All of its actions were characteristic of an investor trying to save his investment, rather than an entrepreneur trying to save his livelihood. D. The Partnership's Passive Nature
The partnership's passive nature is dispositive of its role as a financier rather than an entrepreneur. The partnership intended from the beginning merely to receive royalties, and for the technology to be transferred to TBSI, contractual incantations notwithstanding. Green v. Commissioner, 83 T.C. 667 (1984). See also Bailey v. Commissioner, 90 T.C. 558, 608 (1988), affd. in part and vacated in part on other grounds 912 F.2d 44 (2d Cir. 1990) (the fact that certain language is used is not necessarily determinative of the nature of the transaction). In Everett v. Commissioner, T.C. Memo 1990-65, we found that the partnership's *516 passive nature, limited activities, and lack of authority to control the research project, all pointed to its not being in the trade or business of manufacturing or marketing desktop computer systems. Even though representatives of the partnership met with the research company, we found the purpose of those meetings to be informational only. There is no evidence that the Partnership * * * was involved in, directed, or controlled any phase of the research and development of the project itself. The effect of all of this is that the Partnership never demonstrated that it intended to engage in a trade or business at any time in the future with respect to the resultant technology. The Partnership was merely a passive investor since its formation and had no effective control over the research and development of the project.
Everett v. Commissioner, supra; [6] citation omitted.
This was the case here. The partnership's *517 principal business was merely to enter into a research and development contract with TBSI, not to develop the fused fiberboard or the Mill itself, or even to manufacture or market same. The Research and Development Agreement called for TBSI to present quarterly reports of its progress to the partnership. However, the partnership's general partners did nothing more with these reports than add a cover letter and forward them to the limited partners. The court in Zink v. United States, 929 F.2d 1015 (5th Cir. 1991), disallowed the taxpayers' deduction under section 174 of expenditures in connection with airplane components, in spite of the fact that the taxpayers received reports, kept up with the progress of the project, visited the plant and attended an exhibition of the research. The actions of the partnership's general partners fall short even of those of Dr. and Mrs. Zink. Clyde Cleveland, one of the partnership's general partners, sat on TBSI's board of directors. In that capacity he assumed a fiduciary obligation to TBSI's shareholders. Even if those fiduciary responsibilities were set aside, Cleveland's place on TBSI's board served no purpose other *518 than to monitor the partnership's investment. By his own admission, he and the other TBSI directors allowed TBSI's operations to drift during the time TBSI was performing the fused fiberboard research. This passivity attests to his view that the job of bringing the product to market was that of TBSI. Had he and the partnership's other general partner viewed the partnership's role as the manufacturer or marketer of the results of the research, they would have monitored TBSI's performance under the agreement more closely. Based on the foregoing, we find that the expenditures by the partnership pursuant to its Research and Development Agreement with TBSI were not in connection with a trade or business, as contemplated by section 174. Because of this finding, we need not address the question of whether the expenditure qualified as a research and experimental expenditure under section 1.174-2(a)(1), Income Tax Regs.
To reflect our findings and conclusions herein, Decision will be entered for the respondent. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Use of the word "business" in no way reflects a finding that the research and experimental expenditures were paid in connection with a trade or business, but merely restates the term as used in the limited partnership agreement and is used for the sake of convenience.↩
3. Petitioner and respondent each presented evidence as to the portion of United Fibertech's expenditures that constituted research and experimental expenditures in an experimental or laboratory sense. As we find below that United Fibertech's expenditures were not in connection with a trade or business, we need not address the evidence presented.↩
4. Sec. 174 states in pertinent part as follows: SEC. 174. Research and Experimental Expenditures (a) Treatment as Expenses. -- (1) In General. -- A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to his capital account. The expenses so treated shall be allowed as a deduction. ↩
5. Sec. 162 states in pertinent part as follows: SEC. 162. Trade or Business Expenses. (a) In General. -- There shall be allowed as a deduction all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.↩
6. See also Harris v. Commissioner, T.C. Memo 1990-80↩.