ACTIVE LIPID DEVELOPMENT PARTNERS, LTD., NATURAL PHARMACEUTICAL CORPORATION, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Active Lipid Dev. Partners, Ltd. v. Commissioner
Docket No. 30177-88
United States Tax Court
T.C. Memo 1991-522; 1991 Tax Ct. Memo LEXIS 571; 62 T.C.M. (CCH) 1046; T.C.M. (RIA) 91522; October 21, 1991, Filed *571 Decision will be entered under Rule 155. Norman S. Kulla, for the petitioner. Jack H. Klinghoffer, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent disallowed all of Active Lipid Development Partners, Ltd.'s (Active Lipid or the partnership) expenses for tax year 1983, as follows: Research and Development Expense
$ 540,000
Amortized Organization Costs
200
Amortized Start-Up Costs
17
Total Disallowed Expenses
$ 540,217
The issues for decision are: (1) Whether the $ 540,000 the partnership paid to a related research and development corporation was in connection with its trade or business within the meaning of section 174; [1] and (2) whether the partnership is entitled to amortize its organizational and start-up costs. FINDINGS OF FACT The stipulation of facts, together with attached exhibits, is incorporated herein by this reference. Active Lipid *572 is a California limited partnership whose principal place of business is in the State of California. Scientists at the Weizmann Institute of Science in Rehovot, Israel (Weizmann Institute) invented and initially developed a membrane fluidizer referred to as AL-721. AL-721 appeared to have promise with respect to the effects of senile dementia and withdrawal syndromes from alcohol and opium addiction. In 1981 James M. Jacobson, Jr. (Jacobson) entered into a licensing agreement for AL-721 with Yeda Research and Development Co., Ltd. (Yeda), an Israeli company which engages in the commercial exploitation of scientific developments at the Weizmann Institute. The license agreement required the Weizmann Institute to conduct research for Jacobson, and Jacobson planned to file with the Food and Drug Administration (FDA), arrange for clinical trials, and engage in research and development in the United States. Based on a priority patent filed by the Israelis, Jacobson (with the help of counsel) filed patent applications during 1982 for AL-721 in the United States, Australia, Finland, Norway, Japan, and the European patent countries (designated countries include the United Kingdom, West *573 Germany, France, Italy, The Netherlands, Switzerland, Liechtenstein, Sweden, Belgium, and Luxembourg). Jacobson incorporated Natural Pharmaceuticals Corporation, a California Corporation (NPC) on April 13, 1983, as its president, sole officer, and 100 percent stockholder. NPC was created to market AL-721. On May 10, 1983, NPC submitted an Investigational New Drug application (IND) to the FDA in order to obtain permission to begin clinical testing of AL-721 on humans. On July 12, 1983, the FDA requested that NPC provide additional data and postpone clinical testing. On February 13, 1984, NPC filed the requested supplement to its IND. During June of 1984 certain animal studies were conducted. The FDA responded to the supplemental filing on August 24, 1984, and indicated it would agree to the initiation of limited clinical testing in humans upon being provided with the additional information requested and the results of the animal (toxicology) tests. NPC supplied the additional requested information on November 16, 1984. Finally, on February 22, 1985, the FDA approved commencement of toxicology testing of AL-721 in humans. On September 20, 1983, Active Lipid was formed with *574 eleven limited partners and NPC acting as its general partner and tax matters partner. Jacobson wanted limited partners who by virtue of their positions outside of the limited partnership could be helpful in the furtherance of the project. Active Lipid was formed to fund the research and development needed to bring AL-721 to market. The September 20, 1983 Confidential Private Placement Memorandum for Active Lipid projected the after-tax position of a 50-percent tax bracket limited partner's investment of $ 100,000 for the first three years as follows: Cumulative
Net
Net
Cash
Tax Savings/
After Tax
After Tax
Year
Investment
(Cost)
Cash Investment
Cash Investment
1983
$ (35,000)
$ 38,800
$ 3,800
$ 3,800
1984
(32,500)
2,300
(30,200)
(26,400)
1985
(32,500)
300
(32,200)
(58,600)
In actuality, during tax year 1983 the $ 540,000 research and development deduction on Active Lipid's return resulted in a flow-through loss of $ 76,373 for a limited partner contributing $ 100,000. Accordingly, the actual tax savings for a limited partner in the 50-percent tax bracket who contributed $ 100,000 is $ 38,186.50, which is remarkably close to the $ 38,800 projected *575 tax benefits. Jacobson contributed $ 7,100 to Active Lipid on December 22, 1983. All of the limited partners paid their subscriptions timely, in full, as follows: Name of
Amount of
Payment of Subscription
Ltd. Partner
Subscription
12/83
3/84
1/85
N. Becker
$ 100,000
$ 35,000
$ 32,500
$ 32,500
M. Brittan
50,000
17,500
16,250
16,250
& V. Taub
J. Coburn
100,000
35,000
32,500
32,500
B. Goldsmith
100,000
35,000
32,500
32,500
L. Gonda
100,000
35,000
32,500
32,500
J. Jacobson
25,000
8,750
8,125
8,125
R. Katz
25,000
25,000
0
0
J. Shalant
100,000
35,000
32,500
32,500
Tilles, Webb
25,000
8,750
8,125
8,125
& Kulla
J. Widzer
50,000
17,500
16,250
16,250
D. Zeh
25,000
8,750
8,125
8,125
TOTALS:
$ 700,000
$ 261,250
$ 219,375
$ 219,375
Limited partners who elected to pay the subscription price in installments executed a limited partner's investment note and an assumption agreement subjecting them to personal liability to Mitsui Manufacturers Bank for an amount not to exceed the unpaid balance of their subscription. Active Lipid recorded its certificate of limited partnership on December 22, 1983. On September 21, 1983, NPC created *576 a wholly owned subsidiary, Matrix Research Laboratories, Inc., a California corporation (Matrix). Jacobson created Matrix to limit NPC's liability and to keep the marketing (to be carried on by NPC) and research and development (to be carried on by Matrix) separate. During 1983 NPC, Active Lipid, and Matrix were all located in Jacobson's house. Additionally, during 1983 Active Lipid had no employees; Matrix had one employee; NPC employed Jacobson, his brother-in-law, and a few part-time people. On December 22, 1983, Jacobson assigned the Yeda license agreement to NPC. On December 23, 1983, Active Lipid entered into two agreements: A development agreement with NPC and a research and development subcontract with Matrix. The "Development Agreement" and "R & D Subcontract" in pertinent parts provide: DEVELOPMENT AGREEMENT * * * WHEREAS, NPC desires to engage the Partnership to perform, or to supervise the performance of, such clinical trials and research and other developmental activities; * * * 3. Research and Development Services. The Partnership hereby undertakes to perform all clinical trials and research and developmental activities set out in the statement of work *577 attached to this Agreement as Exhibit A (hereinafter referred to as the "Initial R&D Activities") and to hire all personnel and provide all services required therefor. * * * 4. Royalties or Other Consideration. At any time prior to or upon the completion of the Research and Development Project the Partnership can authorize and instruct NPC to enter into a sublicense agreement with a major pharmaceutical company whereby that pharmaceutical company will be obligated to complete any and all clinical trials and tests necessary to obtain FDA approval, obtain FDA approval, and thereafter manufacture and sell AL within the United States only. In consideration for this sublicense, NPC will receive a royalty or other consideration. In such event the Partnership, as consideration for its services herein, will be entitled to receive twenty percent (20%) of the net royalties or other consideration received by NPC in connection with the sale of the Pharmacological Formulations of AL in the United States. "Net royalties or other consideration" shall mean the gross royalties or other consideration received by NPC from the granting of any such sublicense less the costs of negotiating and *578 administering the sublicense and less all royalties or other consideration which NPC is obligated to pay its licensor, Yeda. * * * As an alternative to the above, the Partnership can elect to have NPC complete the development process and obtain FDA approval for the sale of Pharmacological Formulations of AL itself, in which case NPC would be required to obtain additional financing. Should the Partnership choose this alternative, then its right to share in the net royalties outlined in the first alternative above shall terminate and, instead, the Partnership or the individual Limited Partners will receive a twelve and one-half (12 1/2%) equity interest in whatever entity is utilized to complete the commercialization of AL. In addition to the foregoing, the Partnership shall also be entitled to receive seven and one-half percent (7 1/2%) of the Net Profits which may be realized by NPC in connection with the sale in the United States of Non-pharmacological Formulations of AL. * * * 8. Ownership of Work Product and Patent Rights. (a) NPC shall have, and the Partnership shall cause to be vested in NPC the full and exclusive right, title and interest in and to: (i) all proprietary *579 information and inventions developed, acquired or conceived of, by or on behalf of the Partnership and its subcontractors with respect to the Research and Development Project or otherwise pertaining to AL in performing their obligations under this Agreement; (ii) all physical manifestations or embodiments of such proprietary information and related technical information, including, without limitation, all documents and writings, including clinical and other studies, and all copies thereof developed or made by or on behalf of the Partnership and its subcontractors, including, without limitation, all patent rights, patentable information, patent applications, copyrights, copyright applications, manufacturing information, schematics, specifications, inspection procedures and test procedures; and, (iii) All FDA licenses, approvals and authorizations applied for, including investigational new drug submissions ("IND") and new drug application ("NDA"), and such FDA licenses, approvals and authorizations shall be maintained in the name of NPC. * * *
12. Technical Assistance. NPC agrees to make available to the Partnership or its designee, at reasonable times and places and on *580 reasonable notice, the services of technical personnel to consult with, instruct and assist NPC and/or the Partnership or its designee with respect to the Research Project. 13. Assignment. This Agreement may not be assigned by the Partnership without the prior written consent of NPC. * * *
EXHIBIT A The Partnership will undertake the following: 1. Prepare and file all necessary documents with the FDA in connection with INDAs for the proposed clinical trials. 2. Prepare and file Drug Master File with FDA for the production of Active Lipid. 3. Cause 200,000 grams of AL to be produced, packaged and labeled for the basic research and clinical trials. 4. Conduct subchronic toxicology studies in two species, if required by FDA. 5. Cause a short-term Phase I trial to be conducted and monitored. 6. Initiate Phase II trials to be conducted and monitored in the proposed indications which have obtained INDs. (See attached list). 7. Meet and liase [sic] with the FDA to expedite the filing processes to whatever degree possible. R&D Co. will use its best efforts to convince FDA to allow Phase II to begin without conducting items #4 and 5. In the event *581 this is successful such funds will be applied to continue Phase II clinical trials.
R & D SUBCONTRACT
* * * WHEREAS, the Partnership desires to engage R & D Corporation to perform, or to supervise the performance of, such clinical research, tests, trials, and other developmental activities; and, * * * 3. Research and Development Services. R & D Corporation hereby undertakes to perform all clinical trials and research and development activities, set out in the statement of work attached to the Agreement as Exhibit A, (hereinafter sometimes referred to as the "Research Project") and to hire all personnel and provide all services required therefor. R & D Corporation shall complete the work set out in Schedule A within 12 months from the date hereof (barring circumstances beyond its control). Further, R&D Corporation hereby agrees to make itself available to perform such additional clinical research tests, trials and research and developmental activities (hereinafter sometimes referred to as the "Additional R&D Activities") that the Partnership may be obligated to conduct pursuant to the Development Agreement, on the same terms and conditions as are provided in this *582 Agreement for the performance of the work described on Exhibit A. * * * No portion of the fees to be paid to R & D Corporation under Section 4.1 hereof will be refundable. 4. Fees. 4.1 Payments. In consideration for the services to be performed by R & D Corporation hereunder, the Partnership agrees to pay to R & D Corporation a research and development fee in the amount, subject to Section 4.2 hereof, of $ 550,600.00, payable on or before December 23, 1983, for the work described on Exhibit A, and in such amount and at such time or times as may be mutually agreed upon for the Additional R&D Activities. 7. Inspection and Consultation Resorts.
(a) R & D Corporation will grant to the Partnership and its designated agents, attorneys and accountants, including such technical consultants as may be engaged by the Partnership from time to time and approved by the Partnership, access at all reasonable times to the premises in which services are being performed hereunder and to books and records maintained by the R & D Corporation pertaining to such services, during all business hours. (b) R & D Corporation will also furnish to the Partnership within 45 days from the end *583 of each calendar quarter such periodic progress reports as the Partnership may reasonably require. * * * (c) It is understood and agreed that the methods of research and use of equipment and personnel shall be within the sole discretion of R & D Corporation, and the Partnership shall have no right to control or direct any employee of either R & D Corporation or of any subcontractor in the performance of such services. 8. Ownership of Work Product and Patent Rights. (a) NPC shall have, and R & D Corporation shall cause to be vested in NPC the full and exclusive right, title and interest in and to: (i) all proprietary information and inventions developed, acquired or conceived of, by or on behalf of R & D Corporation and its subcontractors with respect to the Research Project or otherwise pertaining to AL in performing their obligations under this Agreement; (ii) all physical manifestations or embodiments of such proprietary information and related technical information, including, without limitation, all documents and writings, including clinical and other studies, and all copies thereof developed or made by or on behalf of R & D Corporation and its subcontractors, including, *584 without limitation, all patent rights, patentable information, patent applications, copyrights, copyright applications, manufacturing information, schematics, specifications, inspection procedures and test procedures; and, (iii) all FDA licenses, approvals and authorizations applied for, including investigational new drug submissions ("IND") and new drug application ("NDA"), and such FDA licenses, approvals and authorizations shall be maintained in NPC's name. * * *
13. Indemnity. R & D Corporation will indemnify and hold the Partnership and NPC harmless from and against any damage, loss, cost or expense (including reasonable attorneys' fees) arising out of the clinical trials and research performed by or on behalf of R & D Corporation during the term of the Research Project, provided that R & D Corporation has been notified promptly by the Partnership of any claim giving rise to rights of indemnification hereunder R & D Corporation will, at its own expense, defend the Partnership from and against any such claim with counsel reasonably satisfactory to the Partnership; provided, however, that R & D Corporation will permit the Partnership to participate in any such action *585 to the extent such participation is reasonable and the Partnership deems it appropriate; and, provided further, that R & D Corporation will not agree to settlement of any such action without the prior written consent of the Partnership, which consent will not be unreasonably withheld. 14. Assignment. This Agreement may not be assigned by R & D Corporation without the prior written consent of the Partnership. * * *
EXHIBIT A Identical to Exhibit A in the Development Agreement.
Besides the execution of the Development Agreement and the R & D Subcontract, Active Lipid also paid Matrix $ 540,000 on December 23, 1983. The $ 540,000 was derived from $ 261,250 worth of Active Lipid's cash subscriptions and $ 278,750 Active Lipid borrowed from Mitsui Manufacturers Bank. The $ 278,750 loan was fully secured by the limited partners' investment notes, standby letters of credit, and assumption agreements. Jacobson considered the $ 540,000 a prepayment which gave Matrix sufficient capital to go forward with the research of AL-721 and to deal with and close various contracts and other matters. Statement 2 attached to Matrix's 1983 tax return (for the period 7/1/83 through *586 6/30/84) indicates that on 6/30/84 the liability account entitled "deferred contract income" equaled $ 540,000 and Matrix held $ 300,000 in certificates of deposit. Matrix's total deductions during tax year 1983 are as follows: Compensation of officers
$ 21,802
Salaries/wages
7,200
Taxes
200
Auto
1,728
Bank service charge
18
Dues and subscriptions
53
Misc.
918
Office supplies and postage
2,254
TOTAL
$ 34,173
Jacobson did not plan to take the companies public in 1983; however, in January of 1985 all of the shareholders of NPL and all of the limited partners of Active Lipid exchanged their respective shares and interests for shares of common stock in Praxis, a public company. Praxis received written approval to begin preliminary clinical testing on humans on February 22, 1985. However, in late 1985 or early 1986, Jacobson and the limited partners, now shareholders of Praxis, discussed pursuing the application of AL-721 to viruses, including the AIDS virus. Praxis could not accomplish this goal and became dormant. OPINION The first issue for decision is whether Active Lipid is entitled to a deduction for research and experimental expenditures for 1983. Section *587 174(a)(1) allows a taxpayer to currently deduct research and experimental expenditures paid or incurred in connection with the taxpayer's trade or business. A current deduction is also available for expenditures paid or incurred for research or experimentation carried on in a taxpayer's behalf by another person or organization. Sec. 1.174-2(a)(2), Income Tax Regs.
Respondent asserts that Active Lipid's expenditure of $ 540,000 under the R & D Subcontract was not "in connection with" a trade or business because there was no realistic probability Active Lipid would ever engage in an active trade or business. Petitioner contends that Active Lipid is entitled to the section 174 deduction because Active Lipid could have been in a trade or business in some form or other with respect to AL-721. In Snow v. Commissioner, 416 U.S. 500, 40 L. Ed. 2d 336, 94 S. Ct. 1876 (1974), revg. 482 F.2d 1029 (6th Cir. 1973), affg. 58 T.C. 585 (1972), the Supreme Court established that a taxpayer did not have to currently be producing or selling a product in order to obtain a section 174(a)(1) deduction for research and experimental expenses. However, the Snow decision did not *588 eliminate the section 174 trade or business requirement altogether. The taxpayer "must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section [174]." Green v. Commissioner, 83 T.C. 667, 686-687 (1984) (Emphasis in original; fn. ref. and citations omitted). The limited partnership in Green, LaSala, financed the research and development of four inventions, but retained no control over their actual development, production, or marketing. We held LaSala was not conducting research in connection with a trade or business within section 174. LaSala acquired the four inventions and immediately contracted with an unrelated party, NPDC, to develop the inventions in exchange for the exclusive, worldwide right to manufacture, use, and sell the inventions for their patentable lives. After contracting with NPDC, LaSala acted only in a ministerial capacity. We found that LaSala "functioned only as a vehicle for injecting risk *589 capital into the development and commercialization of the four inventions. Its activities never surpassed those of an investor. It was not the up-and-coming business which section 174 is intended to promote." Green v. Commissioner, supra at 687 (Emphasis in original). In Levin v. Commissioner, 87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987), we held the limited partnerships, Dispoard and Labless, entered into manufacturing and marketing agreements which in substance "deprived the partnerships of control over the manufacture, use, and sale of the developed machines for virtually the entire lives of the partnerships." 87 T.C. at 726-727. We found that when Dispoard and Labless were organized in 1979, they never intended to engage in trades or businesses at any time in the future, and this conclusion is supported by the limited nature of their activities in the years following. The role of the partnerships was similar to that of a shareholder who contributes money to a corporation. Even though the corporation may engage in research and experimentation in connection with its trade or business, *590 the shareholder is not in the trade or business and is not entitled to a deduction under section 174. See Deputy v. du Pont, supra. The partnerships, like the shareholders, were mere investors. Therefore, because they did not incur research and experimental expenses "in connection with" trades or businesses, Dispoard and Labless are not entitled to deductions for such expenses in 1979. [87 T.C. at 728.]
Like the limited partnerships in Green and Levin, Active Lipid's activities indicate that it never surpassed the level of an investor. Jacobson issued a confidential private placement memorandum for Active Lipid on September 20, 1983, which projected a direct tax write-off in excess of the amount of cash invested in 1983 by a taxpayer in the 50 percent tax bracket. Active Lipid recorded its certificate of limited partnership on December 22, 1983, one day before it entered into the Development Agreement and the R & D Subcontract. Both of these agreements, executed a little more than a week before the end of 1983, clearly point out the limited role Active Lipid played in the research and development of AL-721. Petitioner, through Jacobson, *591 argues Active Lipid's role was to fund the AL-721 research and development and to participate in the making of business decisions concerning its development. The Development Agreement sets out the research and development activities Active Lipid was required to perform for NPC. Active Lipid subcontracted out all of its research and development duties under the Development Agreement to Matrix in the R & D Subcontract. Paragraph 7(c) of the R & D Subcontract grants Matrix complete and exclusive control over the research and development. Accordingly, Active Lipid did nothing more than collect and borrow funds which it transferred to Matrix, which carried out and arranged all research and development activities NPC desired with respect to AL-721. In substance, NPC formulated the research and development activities it desired and contracted with Active Lipid, of which it is the sole general partner, to perform these duties. Active Lipid in turn subcontracted everything to NPC's 100-percent owned subsidiary, Matrix. NPC's retention of all work product produced by the fruits of Active Lipid's and Matrix's efforts further evidences the transparency of the claim that Active Lipid was *592 engaged in a trade or business. The interrelatedness between Jacobson, NPC, Active Lipid, and Matrix does not change the fact that NPC owns everything with respect to AL-721, except for its obligation to Yeda, and Active Lipid owns nothing. Active Lipid contracted away all of its obligations to Matrix. The performance of at least some of these duties would indicate that Active Lipid could be engaged in a trade or business for purposes of section 174. Active Lipid's only involvement with respect to the development of AL-721 is the right to authorize and instruct NPC to enter into a sublicense agreement with a major pharmaceutical company to complete work on AL-721, or Active Lipid could elect to have NPC complete the research and development process itself. Active Lipid's power with respect to these two options indicates that it had a say in how it would receive either its royalty or equity interest. It is not the type of substantial and regular activities in connection with a product necessary to constitute a trade or business for purposes of section 174. Green v. Commissioner, 83 T.C. 667, 686-687 (1984). Active Lipid functioned only as a passive investment *593 vehicle for injecting risk capital into the development and commercialization of AL-721, while providing substantial pass-through tax benefits to its limited partners. Active Lipid was not the up-and-coming business that section 174 is intended to promote. Green v. Commissioner, supra at 687. The next issue we must decide is whether petitioner is entitled to amortize start-up costs of $ 17. Section 195 permits a taxpayer to amortize start-up expenditures under certain circumstances. One requirement for amortizing start-up expenditures is that they must be incurred in connection with an active trade or business. Sec. 195(c)(1)(A). The legislative history of section 195 emphasizes that section 162 controls for purposes of the active trade or business requirement in section 195. S. Rept. 96-1036 (1980), 1980-2 C.B. 723. In Snow, the Supreme Court found the trade or business requirement in section 174 is more lax than section 162. Snow v. Commissioner, 416 U.S. 500, 502-504, 40 L. Ed. 2d 336, 94 S. Ct. 1876 (1974). We have already held that Active Lipid was not engaged in a trade or business, but instead functioned merely as a passive investor. *594 Since Active Lipid failed to qualify as a trade or business under the more lax section 174 requirements, Active Lipid falls short of carrying on a trade or business for section 162 purposes. The absence of a trade or business within section 162 prevents Active Lipid from amortizing its start-up costs under section 195. We so hold. The final issue for decision is whether Active Lipid may amortize its organizational fees pursuant to section 709(b). Respondent argues that because Active Lipid was not engaged in a trade or business, it was not entitled to begin amortizing these expenses. A partnership is not required to be in a trade or business in order to begin business for purposes of section 709. Diamond v. Commissioner, 92 T.C. 423, 446 (1989), affd. 930 F.2d 372 (4th Cir. 1991). Section 1.709-2(c), Income Tax Regs., states that "a partnership begins business when it starts the business operations for which it was organized." Active Lipid was organized to fund the research and development of AL-721. In the latter part of December 1983 Active Lipid raised $ 261,250 and borrowed $ 278,750 which Active Lipid used to fund the research and *595 development of AL-721 through Matrix. Accordingly, we find the $ 200 organizational expenses were properly amortized in tax year 1983. To reflect our findings and conclusions herein, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the year in issue.↩