AGENCY AUTOMATION PARTNERS, LTD., SHAMROCK AUTOMATION SYSTEMS, INC., TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Agency Automation Partners v. Commissioner
Docket No. 30184-91
United States Tax Court
T.C. Memo 1994-411; 1994 Tax Ct. Memo LEXIS 420; 68 T.C.M. (CCH) 490; August 22, 1994, Filed *420 Decision will be entered for respondent. For petitioner: Robert A. Pierce, Kevin J. Carroll, David J. Hull, and Carla A. Green. For respondent: William R. McCants. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: In a Notice of Final Partnership Administrative Adjustment (FPAA) issued by respondent with respect to Agency Automation Partners, Ltd. (the partnership), for the taxable year ending December 31, 1983, respondent determined that the partnership is not entitled to deductions in the amounts of $ 149,837 claimed as a legal expense, $ 60,000 claimed as an administrative expense, and $ 3.6 million for research and development expense. In an FPAA issued by respondent with respect to the partnership for the taxable year ending December 31, 1985, respondent determined that the partnership is not entitled to a deduction in the amount of $ 2.7 million claimed as a research and development cost. After petitioner's concession, the issues for decision are: (1) Whether the partnership is entitled under section 174 to deduct research and development expenses of $ 3.6 million in 1983 and $ 2.7 million in 1985. We hold that it is not. (2) Whether the partnership *421 is entitled to deduct a $ 60,000 fee paid by it to its general partner in 1983. We hold that it is not. Petitioner concedes the $ 149,837 legal expense adjustment in income tax for the taxable year ending December 31, 1983. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. The principal place of business for both the partnership and Shamrock Automation Systems, Inc. (petitioner, also sometimes hereinafter referred to as Shamrock), its tax matters partner, was in Tallahassee, Florida, at the time the petition was filed. The Florida Association of Insurance Agents, Inc. (Association), a nonprofit trade association, conducted a survey in 1982 to determine the need among its member agencies for an automated insurance rating system. Based on the survey results, Association determined that there was a need for software that could perform multiple company comparative rating, as well *422 as single company rating, for personal and commercial lines of insurance for use on micro or personal computers. Association called such software "the Bundle". The idea and name for the software originated with Thomas C. Johnson (Johnson) and Robert S. Smith (Smith), Association's respective executive vice president and principal. Johnson and Smith previously had worked together on the development of a highly successful and profitable manual insurance rating system called the "Rapid Rater". Association formed Shamrock, a Florida corporation, on October 19, 1983, and the partnership, a Florida limited partnership, on October 24, 1983, to finance, develop, license, and market the Bundle. Association owned the majority of the stock of Shamrock, which was the partnership's sole general partner as well as its tax matters partner. During the years in issue, Johnson served as Shamrock's president and Smith as its vice president, secretary, treasurer, and director. Johnson and Smith were limited partners in the partnership and shareholders in Shamrock. Shamrock leased its business offices from Association during the years in issue. Although Smith could design a program for the Bundle, *423 he lacked the expertise to write a computer code for it. Association selected Policy Management Systems Corp. (Policy), a publicly held South Carolina corporation, to write the computer code for the Bundle. Policy purchased all of Shamrock's preferred stock with a $ 500,000 note. The partnership, Policy, Shamrock, and Association executed several contemporaneous agreements on October 24, 1983. The partnership and Policy entered into a development agreement, a technology license agreement, a lease and marketing agreement, and a purchase option agreement. At the same time, Policy entered into a subdevelopment and submarketing agreement with Shamrock and Association. Pursuant to the development agreement between the partnership and Policy, the former paid the latter $ 3.6 million in 1983, $ 2.7 million in 1984, and $ 2.7 million in 1985 to program the computer code for the Bundle on a "best efforts" basis. A portion of the development fee was paid by Policy to Shamrock for assisting in the design of the Bundle. Under the technology license agreement, the partnership licensed from Policy the nonexclusive perpetual right to use all Bundle development work undertaken by Policy and *424 certain portions of specified Policy technology solely for the purpose of developing and marketing the Bundle. In consideration, the partnership granted to Policy, upon completion of the Bundle or any component thereof, an irrevocable, worldwide license to use all Bundle technology, subject to the terms of the development agreement. Under section 3.02 of the technology license agreement, the partnership remained the sole and exclusive owner of the Bundle, as well as of its additions and improvements. Pursuant to section 3.01(a) of the lease and marketing agreement between the partnership and Policy, the former leased to the latter the exclusive right to use and grant licenses to use the Bundle, including the right to duplicate it for the purpose of selling and transferring to other persons nonexclusive licenses for limited periods of time. The term of the licensing lease began upon completion of the Bundle and continued for 4 years after the end of the development period. Under the agreement, Policy paid to the partnership varying percentages of the monthly license charges paid by licensees of the Bundle. Policy was obligated to license and market the Bundle on a best efforts *425 basis. The partnership could not sell, lease, license, or otherwise transfer the technology or interest therein, without the prior written consent of Policy. After termination of the lease for any reason except the exercise by Policy of its option under the purchase option agreement, Policy was to pay to the partnership for the license a percentage royalty on revenues generated from the sale, exchange, leasing, licensing, or other disposal of any product or portions thereof (except for Policy's own technology), which had incorporated in it, Bundle technology developed under the development agreement. Policy entered into a subdevelopment and submarketing agreement with Shamrock and Association whereby Policy engaged Shamrock, as an independent subcontractor, to assist Policy in designing, developing, marketing and licensing the Bundle for $ 350,000, a line of credit, and a varying percentage of the licensing charges received. Shamrock was to use its best efforts to market and license the Bundle for Policy under Policy's licensing and marketing lease agreement with the partnership. The terms of the subdevelopment and submarketing agreement also provided that Shamrock was solely *426 responsible for installation of the Bundle for the licensed user, for direct customer support, for the instruction, education, and training of the personnel of the licensed end user of the Bundle. Shamrock was obligated to hire and retain staff sufficient in skill and number to perform under the agreement. Association, as majority shareholder of Shamrock, guaranteed the availability of certain of its key personnel and administrative support to assist Shamrock in the performance of its obligations to Policy. In consideration for Shamrock's activities under the subdevelopment and submarketing agreement, Shamrock retained 100 percent of the initial license charges and a percentage of the monthly license charges received thereafter. Title to the Bundle was to remain exclusively in the partnership subject to the terms of the technology license agreement and the purchase option agreement. The partnership's private placement memorandum (offering memorandum) described the role of Shamrock in developing and marketing the Bundle as follows: In addition to acting as General Partner, [Shamrock] will assist in the design of [the Bundle] and will act as exclusive sublicensor for purposes *427 of marketing [the Bundle] to insurance agencies and other entities, pursuant to the Subdevelopment and Submarketing Agreement. * * * The Partnership will not receive any portion of the funds paid to [Shamrock] for its services in sublicensing [the Bundle] or for assisting in the design of [the Bundle].
The percentage allocation of monthly license charges to be received from the Bundle as set out in the partnership's offering memorandum was as follows: Period
Partnership
Policy
Shamrock
prior to 12/31/84
0%
50%
50%
1/1/85 to expiration of
0%
75%
25%
development period
expiration of development
period through 18 months
thereafter
8%
77%
15%
from the 19th month after
expiration of development
period to end of lease term
30%
55%
15%
Policy, Shamrock, and the partnership entered into a purchase option agreement pursuant to which the partnership granted to Policy an option to purchase all of the partnership's right, title to, and interest in the Bundle, exercisable for 18 months following completion of the Bundle's development period. Under the terms of the option, Policy could purchase the Bundle for either $ 7.5 million plus a 15-percent royalty for *428 102 months, or $ 13 million plus an 8-percent royalty for 102 months. It was not known in 1983 whether Policy would find it economically feasible to exercise its option. There was no question in Johnson's mind, however, that Policy would exercise its option if the Bundle proved successful. Shamrock had a second option to purchase all of the partnership's right, title to, and interest in the Bundle for 6 months following the expiration of Policy's option period for the same price. According to the partnership's offering memorandum, of the almost $ 11 million to be received by the partnership from capital contributions, it was anticipated that $ 9 million would be paid to Policy for product development, almost $ 1 million to the financial companies for placement and financial advisory fees, $ 470,000 for organization costs, and $ 370,000 for general and administrative expenses (including $ 60,000 compensation to Shamrock for its services in connection with selling the limited partnership interests), retaining $ 162,000 for contingencies. There were no provisions in the partnership agreement for future contributions by the partners. In 1983, it was unknown what the Bundle would *429 include in terms of number of States, rating plans, and companies, because a project control schedule had not been established, and there was uncertainty as to whether the Bundle could be developed within the time frame and budget contemplated by the development agreement. It also was unknown in 1983 what it would cost to operate and maintain the Bundle, once developed. The partnership's offering memorandum provided projections of the partnership's potential returns under scenarios which assumed: (1) No sale of the Bundle to Policy, and (2) its sale to Policy under the two royalty options. The offering memorandum did not contain a projection for a scenario in which Shamrock exercised its option. In the no sale to Policy scenario, the only category for the partnership's projected operational expenses was general administrative expenses, and the amount remained level at $ 40,000 from 1986 through 1993. Shamrock's activities with respect to development and marketing of the Bundle during the years in issue reflect its responsibilities under the subdevelopment and submarketing agreement. Policy had little or no experience in designing systems for insurance agencies. Shamrock employees, *430 including members of Association, provided significant expertise with respect to insurance agency needs and operations, as well as single company and comparative insurance rating. Shamrock's activities enhanced the likelihood that the Bundle would be successful. During 1984 and 1985, Shamrock was involved in the development of the Bundle on a regular and continuing basis. Shamrock's employees participated in the development of the Bundle's preliminary specifications, writing the functional design specifications, and making recommendations with regard to the Bundle's systems to improve its acceptance and ease of use by agents. Shamrock employees evaluated priorities and assisted in preparing the project control schedule. Shamrock worked with Policy in selecting companies and States for which the Bundle would be developed and in determining a schedule for such development. Shamrock reviewed and approved or rejected the Bundle's screen design, ordering of screens, and program format. From 1983 through 1986, Shamrock employees performed the quality assurance function with respect to the code programmed by Policy. Although Policy was to send the software directly to Bundle subscribers, *431 Shamrock was forced to test and debug the software prior to its installation because of the inadequacy of the software prepared by Policy. Shamrock did quality assurance testing and debugging of the software received every 2-3 days from Policy. Shamrock employees checked each diskette or cartridge sent by Policy by loading the software, checking the screens, and running rating tests. Smith and other Shamrock employees inspected each item to see if it properly functioned and compared the results with those obtained by manual rating. Shamrock employees devised and ran tests, and reported errors and problems to Policy for corrective action. Pursuant to Shamrock's authority with respect to the Bundle in 1984 and 1985, none of the code programmed by Policy was released for marketing and distribution without Shamrock's prior approval. Prior to the first installation of the Bundle, Shamrock oversaw an agency pilot program in Florida in 1984 during which Shamrock was in daily contact with each of 10 pilot agencies owned by members of Association's Automation Committee. Each agency reported its experiences, problems, and suggestions to Shamrock. When the Bundle began to be installed *432 in August 1984, Shamrock handled all Florida installations and all on-site installations for the rest of the country. There were approximately 25 Shamrock employees involved in the installation and sale of the Bundle between 1984 and 1986. Sometime in mid-1985, Policy notified the partnership that it had completed the Bundle in accordance with the terms of the development agreement. Pursuant to the terms of the lease and marketing agreement, the 4-year period during which the partnership was to lease the Bundle to Policy commenced. Shamrock handled all of the marketing of the Bundle until August 1986. Association assisted Shamrock in aggressively marketing the Bundle. Shamrock entered into memoranda of intent with 317 subscribers, receiving $ 100 deposits from each before the Bundle was completely developed. As part of its marketing efforts, Shamrock obtained endorsements of the Bundle (including 17 signed contracts) from 25 State insurance associations. Shamrock sold the Bundle to more than 1,500 subscribers from March 1984 through October 1992. Shamrock handled billing for the Bundle from 1984 to 1986. From 1984 through 1986, Shamrock employees assembled each subscriber's *433 custom Bundle package. Shamrock negotiated an agreement with Computerland, a computer hardware company in Tallahassee, Florida, to acquire computers, modems, memory boards, surge protectors, monitors, and other computer-related products at a reduced cost for subsequent sale to the Bundle subscribers. Shamrock loaded the Bundle software on the computers and delivered the completed package to the Bundle subscribers. Shamrock also upgraded certain computers owned by the Bundle subscribers to make them capable of running the Bundle software. Shamrock profited from the sale of computers. Approximately 10 Shamrock employees handled customer support for the Bundle, and from July 1984 through 1986, they received over 1,000 calls per week. Association provided training to Shamrock employees in insurance matters so that they could field insurance questions from the Bundle subscribers. Shamrock handled user instruction, education, and training. Shamrock developed, published, and maintained two user guides, as well as training and hardware tapes. Shamrock organized and conducted user group meetings to educate subscribers and inform them of product development. Shamrock furnished Policy *434 with advance rating change information to allow for timely updating of the system. On August 8, 1985, additional contracts and amendments to the above agreements were executed to reflect a $ 7 million loan made by Policy to the partnership to finance further modifications and enhancements to the Bundle. Under a submodification agreement between Policy, Shamrock, and Association, Policy agreed to pay Shamrock $ 150,000 as an independent subcontractor for its continued efforts in assisting to develop and market the Bundle. The parties amended the original purchase option agreement to extend Policy's royalty period and provide for an offset against the purchase price in the amount of Policy's loan to the partnership. The Bundle never developed as anticipated. Neither Policy nor Shamrock exercised its option to purchase the Bundle. The partnership retained ownership of the Bundle through 1992. Several years after those in issue, litigation involving disgruntled limited partners against Policy, Shamrock, Association, and the financial companies backing the partnership offering memorandum settled with Policy's forgiveness of the partnership's debts to it in return for Policy's purchase *435 of the Bundle for $ 1.5 million. OPINION Research and Development Expenses
The parties agree that the partnership entered into the 1983 contractual arrangements with a profit motive. The parties have agreed that the research and development costs paid to Policy in 1983 and 1985 will be deductible in full by the partnership if petitioner can establish that in 1983 the partnership reasonably expected to be in a trade or business, or that Shamrock's activities constituted the conduct of a trade or business by the partnership. Section 174(a)(1) provides that a taxpayer may treat, as deductible, research and experimental expenditures paid or incurred during the taxable year in connection with the taxpayer's trade or business that are not chargeable to a capital account. The provisions of section 174(a)(1) apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by the taxpayer but also to expenditures paid or incurred for research and experimentation carried on in the taxpayer's behalf by another person or organization. Sec. 1.174-2(a)(2), Income Tax Regs.
A taxpayer need not currently be producing or selling any product, *436 nor currently be engaged in a trade or business in order to deduct research expenses. Snow v. Commissioner, 416 U.S. 500 (1974). This Court has held that the taxpayer must be engaged in a trade or business "at some time". Green v. Commissioner, 83 T.C. 667, 686-687 (1984). A taxpayer must be more than a mere investor to be entitled to deductions for research and experimentation expenses. Id. at 688. The relevant factors to consider in determining whether a taxpayer intended to enter into a trade or business in connection with which it expended funds for research and development include: The terms of the contractual agreements, the business activities of the partnership, and the financial capacity and incentive of the partnership to exploit the technology in its own trade or business. See Diamond v. Commissioner, 930 F.2d 372 (4th Cir. 1991), affg. 92 T.C. 423 (1989); Spellman v. Commissioner, 845 F.2d 148, 151 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Levin v. Commissioner, 87 T.C. 698 (1986), *437 affd. 832 F.2d 403 (7th Cir. 1987). It is petitioner's position that the partnership was engaged in a trade or business in the years in issue through the activities of its general partner, Shamrock. The parties agree that Shamrock was actively involved in the design, development, marketing, and licensing of the Bundle throughout the years in issue. They disagree as to whether Shamrock's activities were attributable to the partnership. We conclude that Shamrock was not acting on behalf of the partnership and, therefore, its activities did not cause the partnership to be engaged in a trade or business during the years in issue. Shamrock entered into the subdevelopment and submarketing agreement with Policy in the capacity of independent subcontractor, not as a general partner. The majority, if not all, of Shamrock's activities during the years in issue were performed pursuant to its obligations to Policy under the subdevelopment and submarketing agreement. Shamrock received from Policy fees and a percentage of the licensing charges for its activities with respect to the Bundle. The partnership's offering memorandum explicitly delineates Shamrock's *438 role when it states that the partnership would not receive any portion of the funds paid to Shamrock for its services in sublicensing and assisting in the design of the Bundle. The terms of the agreements executed between the partnership, Policy, and Shamrock, as well as those of the partnership offering memorandum, provide that Policy was to develop and market the Bundle with the assistance of Shamrock, in the latter's capacity as independent subcontractor, not as general partner. To the extent that Shamrock performed activities beyond the scope of the subdevelopment and submarketing agreement, petitioner has not proven that any activity was performed in Shamrock's capacity as general partner. Consequently, Shamrock's activities are not attributable to the partnership and, therefore, the partnership was not engaged in a trade or business with respect to the Bundle during the years in issue. The parties agree that Shamrock had a fiduciary duty to the partnership. Petitioner argues that the fiduciary duty was sufficient to attribute all of Shamrock's activities to the partnership. However, it is not improper for Shamrock to operate in other capacities, and we have found that the *439 transaction called for Shamrock to carry out its activities in design, development, marketing, and licensing as an independent subcontractor. This is the way the transaction was structured, and all parties were aware of it. To the extent that Shamrock had fiduciary obligations to the partnership, it carried out those obligations and was not in breach thereof. Those fiduciary obligations, by themselves, do not cause automatic attribution of Shamrock's activities to the partnership. We next determine whether the partnership had any realistic prospect of entering a trade or business involving the Bundle in the future. The grant of an exclusive license to exploit technology prior to commencement of research and development may preclude a licenser from engaging in a trade or business with respect to the technology. Spellman v. Commissioner,supra;Levin v. Commissioner,supra;Green v. Commissioner,supra.Where a partnership granted an option to exploit technology to a research contractor that was also the partnership's general partner, we held there was no realistic prospect *440 that the partnership would exploit the technology in its own trade or business. Diamond v. Commissioner,supra.
In Diamond v. Commissioner, supra, a limited partnership granted an option to acquire an exclusive license to new technology under a research and development agreement to a research corporation that was also the partnership's general partner. Through subcontracts with the partnership, the research contractor/general partner had complete control over the research and development phase of the product. In addition to delegating responsibility for the actual research and development work of the project, the partnership agreement provided that if the general partner determined that the manufacturing, production, or marketing of any product resulting from the research and development work should be carried out by the general partner or any of its affiliates, such activity shall be carried out by it in the capacity of an exclusive and irrevocable licensee and not in its capacity as the general partner. Diamond v. Commissioner, 92 T.C. at 429. Even though the partnership in Diamond had not given up all of its rights to the *441 technology at the time the agreement was executed, we determined that no realistic prospect existed that the partnership ever would enter any trade or business relating to the technology in light of the rights conferred upon the general partner in the partnership agreement. Id. Adopting the reasoning of Spellman v. Commissioner, 845 F.2d 148, 151 (7th Cir. 1988), affg. T.C. Memo. 1986-403, this Court determined that even if the partnership agreement provisions created only an option in favor of the general partner, there was no realistic prospect that the technology ever would be exploited in a trade or business carried on by any other than the general partner. Diamond v. Commissioner, 92 T.C. at 439. The Court of Appeals for the Fourth Circuit affirmed our conclusion that a partnership with no control over the activities in which it invests is more properly classified as an investor and cannot be engaged in a trade or business in connection with those activities. Diamond v. Commissioner, 930 F.2d at 376. We conclude that the principles established in *442 Diamond v. Commissioner, supra, and the cases cited therein, control the outcome of this case. Petitioner neither cites nor attempts to distinguish the facts of this case from those in Diamond. The substance of the agreements executed between the partnership, Policy, and Shamrock is that the partnership never intended to enter actively a trade or business involving the Bundle, either during the years in issue or at any point thereafter. Prior to commencement of the Bundle's development, the partnership granted to Policy an exclusive license to market the Bundle for a period commencing with the Bundle's completion until 4 years thereafter. Policy, in turn, subcontracted with Shamrock, as an independent subcontractor, to sublicense the Bundle. As discussed above, Shamrock's activities developing, marketing, and licensing the Bundle are not attributable to the partnership. Consequently, Policy and Shamrock, and not the partnership, were engaged in exploiting the Bundle during the years in issue. Furthermore, at the same time the partnership granted Policy an exclusive license to market the Bundle, the partnership also gave Policy an option to buy the Bundle 18 months *443 after the development period. It was fully anticipated that if the Bundle were successful, Policy would exercise its option. While the partnership retained ownership of the Bundle, it effectively contracted away its right to carry on a trade or business with respect to the Bundle. The partnership's lack of intent ever to enter a trade or business with respect to the Bundle is also evidenced in the partnership's offering memorandum. The offering was intended to raise total capital of $ 11 million. Over 80 percent of this amount was paid to Policy for product development. After organizational costs, an inadequate amount of working capital (less than 2 percent) remained in the partnership with which to operate a trade or business. The partnership agreement did not provide for further capital contributions. In fact, when the partnership needed more money in 1985, it borrowed from Policy, using the Bundle as collateral. Lastly, our conclusion is further supported by the offering memorandum's financial projections for the partnership's limited expenses with respect to the Bundle in the event that it was not sold to Policy. The record establishes that from the beginning of the *444 project the partnership was not in the position, nor did it intend at any future date, to actively be engaged in the business of exploiting the Bundle. Consequently, the partnership's role was that of mere investor, and it had no reasonable prospect of entering a trade or business as required for research and development expenses to be deductible under section 174. Administrative Expenses
The partnership deducted $ 60,000 as an administrative fee paid to Shamrock in 1983 for activities performed by its officers, directors, and employees in connection with the Bundle in the early months of the partnership's existence. Respondent disallowed the deduction on the basis that the $ 60,000 payment represents a nondeductible organizational expense under section 709(a). Petitioner argues that the payment was a deductible administrative expense under sections 162(a) and 212. Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred by a taxpayer carrying on a trade or business. Section 212 allows a deduction for ordinary and necessary expenses paid or incurred for the production of income. Section 709(a) provides that, absent an election to amortize *445 organizational expenses, no deduction is allowed for any amounts paid or incurred to organize or promote the sale of an interest in a partnership. Section 709(b) provides that a partnership may elect to amortize certain organizational expenses over a 60-month period. Syndication expenses connected with issuing and marketing of interests in the partnership, however, are not deductible as organizational expenses. Sec. 1.709-2(a), Income Tax Regs.
Petitioner does not argue that this was an amortizable organizational expense. Rather, petitioner relies on Johnson's testimony that the $ 60,000 payment was an administrative fee paid for "everything that [Shamrock was] doing" as general partner. We already have concluded that the partnership was not carrying on a trade or business. Petitioner has failed to specify which of Shamrock's activities in 1983 the $ 60,000 payment was intended to compensate. As discussed above, Shamrock was compensated for the majority of its activities relating to the Bundle by Policy under the subdevelopment and submarketing agreement. Moreover, the partnership's offering memorandum designates as an administrative expense a $ 60,000 payment to Shamrock *446 for its work in connection with selling limited partnership interests in 1983. Petitioner has done little to assist us in tracing the $ 60,000 payment, and the record supports a conclusion that it was a nondeductible organizational expense. See Diamond v. Commissioner, 92 T.C. at 445. We therefore sustain respondent on this issue. In accordance with the foregoing, Decision will be entered for respondent.